Margaret SKILL and Arthur J. Skill, Jr., Husband and Wife, Plaintiffs,

v.

B. G. MARTINEZ, M.D., Richard Renza, M.D., and Ortho Pharmaceutical Co., Defendants.

Civ. A. No. 78–2893.

United States District Court, D. New Jersey.

Aug. 17, 1981.

Blank, Rome, Comisky & McCauley by Norman Perlberger, Larry Haft, Philadelphia, Pa., and Davis & Reberkenny by Edward A. Kondracki, Cherry Hill, N. J., for plaintiffs.

Robert Sparks, Johnson & Johnson, Office of Gen. Counsel, New Brunswick, N. J., and Parker, McCoy & Criscuolo by Jeanne A. Taylor, Mount Holly, N. J., and Patterson, Belknap, Webb & Tyler by Karl E. Seib, Jr., New York City, for defendant, Ortho Pharmaceutical Corp.

## OPINION

COHEN, Senior Judge:

In this products liability-medical malpractice action, plaintiffs Margaret Skill and her husband, Arthur Skill, Jr., assert that Mrs. Skill suffered a cerebral vascular accident (CVA), commonly known as a stroke, resulting from her ingestion of an oral contraceptive pill (Ortho Novum), manufactured by the defendant, Ortho Pharmaceutical Corporation (Ortho). Plaintiff husband sues *per quod*.

Additionally, plaintiffs asserted medical malpractice claims against two treating physicians, Dr. Geronimo B. Martinez and Dr. Robert Renza. On the fifth day of the trial, the plaintiffs settled with the doctors for a total of $50,000.00.

After a trial, lasting almost three weeks and producing over 2,500 pages of transcript, a jury returned a verdict in favor of both plaintiffs in the amounts of $220,-000.00 for Margaret Skill and $30,000.00 for Arthur Skill, Jr. In response to special interrogatories submitted by the Court, the jury found that Margaret Skill's thrombotic stroke was caused by her former use of Ortho Novum in conjunction with her smoking; that Ortho's warnings regarding the risks jointly created by the pill and smoking were inadequate and further, that such inadequacy was a proximate cause of Margaret Skill's stroke; that Dr. Martinez was negligent and guilty of malpractice for failing to warn Margaret Skill of the risks of Ortho Novum and that such negligence was a proximate cause of Margaret Skill's stroke; that Dr. Renza was not at fault; that the causative fault of Ortho was 35% of the total and that of Dr. Martinez accounted for 65% of the total. Pursuant to these findings, a judgment against Ortho in the amount of $87,500.00 was entered.

Defendant Ortho now moves, pursuant to Fed.R.Civ.P. 50(b), for judgment notwithstanding the verdict or, in the alternative, pursuant to Fed.R.Civ.P. 59, for a new trial.

Also before the Court is a motion by plaintiffs for judgment n. o. v., claiming that there was not sufficient, competent evidence for the jury to have found any fault on the part of Dr. Martinez. The plaintiffs request that the Court strike the verdict against Dr. Martinez and enter judgment against Ortho alone for the full amount determined by the jury.

■ We shall address defendant Ortho's motion first. As a general rule, a motion for judgment notwithstanding the verdict is technically a renewal of a motion for a directed verdict made at the close of evidence. The standard for granting judgment n. o. v. is the same as that for directing a verdict, and it can be granted only if such motion should have been granted. *See Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir. 1970). Whether the evidence is sufficient to create an issue of fact for the jury is solely a question of law to be determined by the Court. *See United States v. Bucon Construction Co.*, 430 F.2d 420 (5th Cir. 1970). The question the Court must ask of itself is whether there is sufficient evidence upon which the jury could properly find a verdict for the party against whom the motion is directed. If the answer to this question is "yes", then the motion for judgment n. o. v. must be denied. *Improvement Co. v. Munson*, 14 Wall. (81 U.S.) 442, 448 (1871). The Court is not free to weigh the evidence, or pass on the credibility of witnesses, or to substitute its judgment of the facts for that of the jury's in its determination of whether the evidence is sufficient. *See Tennant v. Peoria & P. U. Ry. Co.*, 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944); *Lind v. Schenley*, 278 F.2d 79 (3d Cir. 1960). Instead, the Court must view the evidence most favorably to the party against whom the motion is made, *see Galloway v. United States*, 319 U.S. 372, 63 S.Ct. 1077, 87 L.Ed. 1458 (1943), and give that party the benefit of all reasonable inferences which may be drawn from the evidence. *See Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969). These restrictions and requirements are all in keeping with the basic principle that there must be a minimum of interference

with the jury. The law in the Third Circuit is stated as follows:

In determining whether judgment n. o. v. should be awarded, the court should consider only the question of law as to whether when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorable to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case.

*Lewin v. Metropolitan Life Insurance Co.*, 394 F.2d 608, 613 (3rd Cir. 1968), citing *Morris Brothers Lumber Co. v. Eakin*, 262 F.2d 259 (3d Cir. 1959); *Monsen v. Consol. Dressed Beef Company, Inc.*, 579 F.2d 793 (3d Cir. 1978), *cert. denied, sub nom. First Pennsylvania Bank, N.A. v. Monsen, et al.*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). We believe that there was sufficient evidence from which reasonable men, in the impartial exercise of their judgment, could have concluded that Ortho was liable for plaintiff's injuries. Even if the facts were undisputed, which they are not in the instant case, the issue must be submitted to the jury if conflicting inferences may be drawn from the facts. *See Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969); *Silverii v. Kramer*, 314 F.2d 407, 409 (3d Cir. 1963); *Thomas v. Kaufmann's*, 436 F.Supp. 293, 297 (W.D.Pa.1977). For the reasons articulated below, defendant Ortho's motion for a judgment n. o. v. shall be denied.

■ Now, as to the defendant's alternative motion for a new trial, generally speaking, the grant or denial of a new trial is governed by Fed.R.Civ.P. 59 which recognizes a common law principle of imposing a duty upon the District Court Judge to order a new trial if he deems it is in the interest of justice to do so. *Kernan v. Gulf Oil Corporation*, 201 F.Supp. 117, 121 (E.D.Pa. 1961), *aff'd* as to new trial, 312 F.2d 737 (3d Cir. 1963). Under Rule 59, once the motion for judgment n. o. v. has been denied, the alternative motion for a new trial must be considered as if it had been made independently. *Thomas v. Kaufmann's*, 436

F.Supp. 293, 298 (W.D.Pa.1977). Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has occurred, or that substantial justice has not been done. *Morgan v. Bucks Assoc.*, 428 F.Supp. 546 (E.D.Pa.1977). The burden of showing harmful error rests on the party seeking a new trial. Ultimately, the motion invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited. *See Globe Liquor Co. v. San Roman*, 332 U.S. 571, 68 S.Ct. 246, 92 L.Ed. 177 (1948). Fed.R.Civ.P. 61 provides that no error "is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice." Thus, it is only those errors that have caused substantial harm to the losing party that justify a new trial. Errors that are not prejudicial do not call for relief under Rule 59.

Defendant Ortho's arguments shall be addressed in the order in which they appear in its supporting memorandum of law.

### A. *Motion for a New Trial*
### I.

*The Ex Parte Communication to the Jury*

█ Defendant's first point is that a communication from the jury to the Court at 9:55 on the morning of the second day of its deliberations, prior to the arrival of counsel for Ortho and the written response by the Court, created reversible error as did the Court's refusal to reinstruct the jury. The actual note was returned to the jury and apparently inadvertently destroyed after its deliberations were completed. However, a record of the occurrence was made. (Tr. 2558–2571). The query to the Court was to the effect, "What about Ovulen–21?

Is this a birth control pill or does it control ovulation?" The Court's response was: "This is just another birth control pill that has nothing to do with this case." An understanding of the communication from the jury and the Court's response is best understood in the context of the situation. The scenario was as follows:

When the Court was recessed the day before this occurrence, Mr. Robert Sparks, from the office of the general counsel for Johnson and Johnson, the parent company of Ortho, who was counsel during the entire fourteen days of trial, conducted all the direct and cross-examination of witnesses, made opening and closing statements, voluntarily absented himself, and never advised the trial judge that he would not be present during the second day of jury deliberations. Ms. Jeanne Taylor, with all due respect, was not counsel as defendant keeps referring to her in its brief. She was local counsel, pursuant to local rules, Mr. Sparks having been admitted pro hac vice. As local counsel Ms. Taylor did not have the responsibility of conducting the trial—did not open, close, examine or cross-examine any witnesses. Furthermore, Mr. Sparks did not ask to be excused from appearing the following day. The Court believes it is trial counsel's duty to remain in the case until a verdict is returned. When the jury submitted its question to the Court, Ms. Taylor, local counsel was also not present. Although Ms. Taylor did inform the Court's law clerk by telephone at about 9:20 a. m. that she had automobile trouble,[1] the Court was confronted with a problem: Was it to respond to the jury by saying, "I can't answer your question because defense counsel are not here"? Would the proper procedure have been to have the jury return to

---

1. Actually, Ms. Taylor made two telephone calls that morning to the Court's clerk. The first one indicated that she was having car trouble; the second call came about one-half hour later and informed the same law clerk that her mother was going to drive her to court as she could not start her car. Ms. Taylor states in an affidavit filed with the Court on July 22, 1981 that she lives twenty minutes from the Courthouse and since she called at 9:30 a. m., "I could not have arrived much later than 10:00 a. m." The Court was not made aware of her arrival until about 10:45 a. m. Of course, the best evidence of when Ms. Taylor arrived is neither her memory, nor the Court's, but the security ledger signed by persons having business before the Court. Unfortunately, on April 23, 1981, the day when the note was received from the jury, Ms. Taylor failed to sign the register. It is to be borne in mind that this Court convenes at 9:30 A.M.

the courtroom in the presence of the court reporter and counsel for plaintiffs,[2] so that the jury would observe the absence of counsel for defendant? Had either of these two methods been utilized, Ortho might very well have been prejudiced by calling to the attention of the jury the absence of its counsel. How long was the Court to wait for the arrival of local counsel? "A party through his counsel may, by voluntarily absenting himself from the courthouse without making adequate arrangements by which he can be reached, be deemed to waive his right to be present. *Any other rule would permit an irresponsible attorney, by his absence, to render the court powerless.*" *McKnelly v. Sperry Corp.*, 642 F.2d 1101, 1108 (8th Cir. 1981) (emphasis added). Additionally, it was the Court who brought this matter to the attention of Ms. Taylor when she arrived. She was told exactly what had taken place and asked for her approval which she granted.[3] Subsequent thereto, for some reason unknown, she changed her mind and almost one and one-half hours after the disputed note was received, she objected and requested that the jury be recharged on the significance of Ovulen–21.

Ortho cites *Arrington v. Robertson*, 114 F.2d 821 (3d Cir. 1940), in support of its position that sending a note to a jury without counsel's presence mandates a new trial. However, *Arrington* clearly states that a party or his counsel may waive the right to be present at every stage of the trial by voluntarily absenting himself from the courtroom. In the instant case, Mr. Sparks voluntarily absented himself without the courtesy of informing the Court, or anyone on its staff, that he had planned not to be present during the second day of jury deliberations. Surely, as an experienced trial lawyer, he must have been aware that a jury often has questions and requires clari-

fications from the Court during its deliberations. *See Macartney v. Compagnie Generale Transatlantique*, 253 F.2d 529 (9th Cir. 1958); *Hartol Petroleum Corp. v. Cantelou Oil Co.*, 107 F.Supp. 373 (W.D.Pa.1952); *Snyder v. Lehigh Valley R. R. Co.*, 245 F.2d 112 (3d Cir. 1957) (concurrence).

The case at bar is distinguishable from *Fillipon v. Albion*, 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919), cited by defendant, where the Supreme Court said:

> *Under ordinary circumstances and wherever practicable*, the jury ought to be recalled to the courtroom, where counsel are entitled to participate and bound to presume, in the absence of notice to the contrary, that all proceedings in the trial will be had. In this case, the trial court erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction. (emphasis added).

In the instant case, the Court expressly *refused* to supplement its instructions when it replied, "Ovulen–21 has nothing to do with the case." The only reference in the record to Ovulen–21 appears at Tr. 268 when counsel for Dr. Martinez mentioned the pill in discussing Mrs. Skill's medical records in 1975, two years before her stroke. There was no testimony as to its ingredients, manufacturer, instructions, etc. Plaintiffs did not institute suit against the manufacturer of Ovulen–21, nor did Ortho bring it in as a third-party defendant. Mrs. Skill took the pill for one month in 1975 and it was decidedly irrelevant to the issues in this case.

In *Snyder v. Lehigh Valley R. R. Co.*, 245 F.2d 112, 116 (3d Cir. 1957), the court opined that the trial judge should have admonished the jury that the plaintiff's re-

---

**2.** The Court was of the view that the absence of defense counsel should not preclude the plaintiffs' counsel from being informed of the jury's query and the Court's response thereto, to which there was no objection.

**3.** In her affidavit, Ms. Taylor states that she found out about the note, inadvertently, from

the court reporter. However, the Court was under the impression, and was never told otherwise, that local counsel learned of the note when she stood in the judge's library and said she had no objection to the Court's reply to the note.

ceipt or non-receipt of workers' compensation was not in the case; that they must put it out of their minds.

The court stated as follows:

Instead, by his reply, the trial judge in effect gave judicial sanction to the jury's consideration of an issue which was not only irrelevant but foreign to the basic question of negligence which it was to decide. Moreover, the reply amounted to testimony given after the case was closed, with no opportunity to either counsel to object to its admission on the ground of irrelevancy.

*Snyder v. Lehigh Valley R. R. Co.* at 116.

In the case before us the contrast is apparent. The Court refused to sanction the consideration by the jury of an irrelevant issue.

■ Finally, assuming arguendo that the Court's failure to wait indefinitely for the arrival of defendant's counsel constituted error, we believe that the defendant's argument on this point must be refuted under the harmless error rule, Fed.R.Civ.P. 61, since the alleged error was not prejudicial to the defendant. *See Dixon v. Southern Pacific Transp. Co.*, 579 F.2d 511, 513 (9th Cir. 1978); *United States v. Compagna*, 146 F.2d 524, 528 (2d Cir. 1944), *cert. denied*, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945).

## II.

### Dr. Strenger's Testimony

■ Defendant's second argument is that it was reversible error to permit Dr. Lawrence Strenger to testify for the plaintiffs and, further, to testify outside the confines of his report. Although Dr. Strenger was listed in the final pretrial order under the category of plaintiffs' witnesses as to liability and was also included in plaintiffs' expert witness list, Ortho asserts that this was not notice to it that Dr. Strenger would testify as to causation. Dr. Strenger was a crucial witness in plaintiffs' case.[4] If the Court had excluded his testimony, that in

itself might have constituted an abuse of discretion, according to *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977). The guidelines set out in that opinion as to inclusion or exclusion of important witnesses are as follows:

(1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified: (Plaintiff responds that Ortho was fully aware of Dr. Strenger's theory of causation because it appeared in Mrs. Skill's medical records following her stroke. Dr. Strenger, a neurosurgeon, was her treating physician);

(2) the ability of that party to cure the prejudice: (Mr. Sparks, Ortho's counsel, was given the opportunity by the Court to depose Dr. Strenger at a convenient time before attempting cross-examination of the witness. Although Dr. Strenger had serious health problems, it was agreed by all parties and the Court that he could be deposed the following week. However, Ortho's counsel decided to withdraw its request for the deposition and proceeded to cross-examine Dr. Strenger without it);

(3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient management of the trial: (Dr. Strenger *was* listed in the final pretrial order);

(4) bad faith or willfulness in failing to comply with the Court's order: (The Court fails to find any evidence of bad faith on the part of the plaintiffs' counsel and considers this allegation by Ortho to be devoid of factual basis and without merit).

We have recently held that the exclusion of critical evidence is an extreme sanction, *Dudley v. South Jersey Metal, Inc.*, 555 F.2d 96, at 99 (3d Cir. 1977), not normally to be imposed absent a showing of willful deception or "flagrant disregard" of a court order by the proponent of the evidence.

*Meyers v. Pennypack Woods Home Ownership Ass'n, supra*, at 905.

---

4. Although Dr. Hillibrand was originally listed as a causation witness, he was not called because he was an obstetrician/gynecologist and

not considered to be an expert on causation of strokes.

The Third Circuit has clearly held that the determination as to whether or not parties should be held to the pretrial order regarding inclusion or exclusion of witnesses is a matter of discretion for the district court. *Ely v. Reading Co.*, 424 F.2d 758, 763–764 (3d Cir. 1970); *Moore v. Sylvania Electric Products, Inc.*, 454 F.2d 81, 84 (3d Cir. 1972); *Southard v. Independent Towing Co.*, 453 F.2d 1115, 1119–1120 (3d Cir. 1971) (per curiam); *Martella v. Great Atlantic & Pacific Tea Co.*, 418 F.2d 1246, 1247 (3d Cir. 1969) (per curiam).

## III.

### ORTHO'S DUTY TO WARN

■ Defendant's third argument, in support of its motion for a new trial, is that it was severely prejudiced by plaintiffs' counsel's reference to Ortho's duty to directly warn consumers. It claims that because Ortho had no legal duty to warn consumers, beyond Food and Drug Administration (FDA) requirements, any comments as to patient warnings were misleading, irrelevant and prejudicial. Additionally, Ortho asserts that references by its adversary to the development and inadequacy of the FDA-required patient warning label was detrimental to its defense.

As to the first point, this Court firmly believes that its jury charge covered extensively the well-settled rule that Ortho had a duty to warn physicians and not consumers of risks in the use of prescription drugs:[5]

The plaintiffs do not contend that the oral contraceptive per se, that is, of itself, was defectively manufactured or distributed. However, they do maintain that Ortho's failure to adequately warn the physicians rendered the pill defective . . . in a case such as this, a manufacturer has a duty to warn members of the medical profession of [dangers] or limitations of its product where the use of its product is dangerous to a user who is ignorant of

such dangers or limitations and the manufacturer has no reason to believe that a physician will recognize the dangers or limitations and communicate these to his patient. (Tr. 2513, 2514).

The Court also instructed the jury that

In order for you to determine that the warning is not adequate, the warning must be in a form that could not reasonably be expected to catch the attention of a reasonable physician under the circumstances or the content of the warning does not contain a fair indication of the nature and extent of the dangers or limitations to the mind of a reasonable physician. (Tr. 2514, 2515).

Any misconception that the jury might have had concerning the duty of Ortho to warn consumers directly was certainly cured by the Court's emphasis in its charge that

[i]n the case of non-prescription drugs it is the duty of the manufacturer to issue adequate warnings directly to the consumer which are indicated on the package or bottle. *However, in the case of prescription drugs, the manufacturer's duty to warn runs to the prescribing physician and not the patient.* (emphasis added). (Tr. 2515).

At the risk of redundancy, one more excerpt from the jury charge illustrates the weakness of Ortho's complaint that the jury might have felt Ortho had a legal duty to warn Mrs. Skill directly:

A physician acts as a learned intermediary between the manufacturer and the patient. Prescription drugs are likely to be complex medicines. Therefore, it is the duty of the manufacturer to fairly and adequately instruct and warn the physician and to fully apprise him of the proper procedure for the use of and side effects and dangers involved in its product *so that the prescribing and treating physician may communicate these needs*

**5.** *See Torsiello v. Whitehall Laboratories*, 165 N.J.Super. 311, 323, 398 A.2d 132 (App.Div. 1979), *cert. denied*, 81 N.J. 50, 404 A.2d 1150 (1979); *Chambers v. G. D. Searle & Co.*, 441 F.Supp. 377 (D.Md.1975), *aff'd*, 567 F.2d 269 (4th Cir. 1977); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir. 1974), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).

*to his patient.* (emphasis added). (Tr. 2516, 2517).

The Court also rejects Ortho's second point that it was prejudiced by plaintiffs' reference to FDA-mandated patient warnings. The Court instructed the jury that the fact of Ortho's compliance with standards of custom and usage in the industry and with federal statutes and regulation is some evidence of adequacy of those warnings, but advised the jurors that they were not compelled to find the warnings adequate because they had FDA approval:

> These approvals are one factor to be considered by you, together with all of the other evidence relating to the adequacy of the warning ... Compliance with FDA regulations is not conclusive on the question of whether Ortho satisfied its duty to warn physicians and ultimately through the physician the patient of all known or foreseeable risks. (Tr. 2519).

Again, this stress on warnings to the medical profession could have left no doubt in the jurors' collective minds that FDA approval of warnings to *physicians* are not conclusive as to Ortho's liability. This concept of refusing to grant total immunity to the drug manufacturer for following minimal standards has been adhered to by courts throughout the country. *See Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652 (1st Cir. 1981) (also involved Ortho-Novum and affirmed lower court's denial of motion for new trial); *Salmon v. Parke, Davis & Co.,* 520 F.2d 1359, 1362, 1362 (4th Cir. 1975) (reversed summary judgment for defendant); *D'Arienzo v. Clairol, Inc.,* 125 N.J.Super. 224, 310 A.2d 106 (Law Div. 1973) (mere compliance with federal regulations does not bestow immunity from § 402A liability).

The Oregon Supreme Court dealt with this issue in a well-reasoned opinion.

" ... [W]e agree with the Supreme Court of California that '[t]he warnings required by such agencies may be only minimal in nature and when the manufacturer or sup-plier knows of, or has reason to know of greater dangers not included in the warning, its duty to warn may not be fulfilled' ". *McEwen v. Ortho Pharmaceutical Corp.,* 270 Or. 375, 528 P.2d 522, 523 (1974), quoting *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 53, 507 P.2d 653, 661 (1973). Any references, during the trial, to FDA patient warnings, as opposed to physician warnings, were clarified by the charge to the jury.

The defendant also contends that one of the special interrogatories submitted to the jury might have resulted in confusion about whether the drug company must warn the doctor or the patient about smoking, ingesting the pill and the risk of stroke. The special interrogatory complained of read in its entirety as follows:

"2. Were Ortho's warnings inadequate regarding smoking in conjunction with taking the pill, and if so, was such inadequacy, a proximate cause of Mrs. Skill's stroke?"

The record reveals no objection to this interrogatory. In the unlikely event that the jury was unclear about who was to be warned, the fact remains, and the record so reveals, that the Court charged that Ortho's duty was to warn only the physicians. More importantly, the record is devoid of any warnings whatsoever regarding smoking prior to August 1976.[6]

There was a plethora of evidence presented to the jury that Ortho never warned of smoking, in conjunction with taking the pill, through its usual communications with the medical profession: "Dear Doctor" letters (written to advise physicians of side effects of drugs); Physicians' Desk Reference (a drug manual); package inserts (included in samples of pills provided to doctors); and comments by drug "detail men" (drug salesmen who visit physicians). In fact, Dr. Samuel Pasquale, Executive Director of Medical Research for Ortho from July 1972 to July 1980, and responsible for package inserts and warnings involving Or-

---

**6.** August 1976 was the last date of Mrs. Skill's ingestion of Ortho-Novum, and the relevant date for purposes of this case.

tho-Novum, testified that there were no such warnings despite medical studies and articles by respected scientists, reporting a link between smoking, the pill and strokes (Tr. 1115). Additionally, Dr. George Braun, Vice President of Research for Ortho from 1972–1980 and also intimately involved with Ortho-Novum, testified that he was aware of reports indicating a potential association between smoking, ingesting the pill and stroke, but no reference to this appeared in the Physicians' Desk Reference up to 1976. (Tr. 961).

The following colloquy between plaintiffs' counsel and Dr. Pasquale illustrates this failure to warn of smoking in conjunction with taking oral contraceptives and the impact it must have had on the jury when it considered special interrogatory 2:

Q. What did Ortho do after 1970 to alert physicians that at least Sartwell and Ravenholt[7] would suggest that you shouldn't smoke if you take the pill?

A. At that point in time I don't recall that we did anything particularly with these articles. They were preliminary articles.

Q. I know, you didn't do anything, though, did you? You didn't put it in your package inserts, you didn't put it in your "Dear Doctor" letters?

A. No, we did not put this in our package inserts.

Q. You didn't put it in "Dear Doctor" letters, either, did you?

A. No.

Q. You didn't tell any physicians in writing or through your salesmen that people shouldn't smoke if they were on the pill, did you?

A. Not that I recall, no. (Tr. 1115).

### IV.

*References to Post-Stroke Occurrences*

■ Defendant next argues that plaintiffs' counsel caused it irreparable prejudice by bringing to the jury's attention post-1976 occurrences, after Mrs. Skill stopped ingesting the pill.

At the outset, it must be noted that counsel for plaintiffs was correctly permitted to refer to post-stroke articles concerning smoking and use of the pill in order to prove *causation*. In fact, counsel for Ortho repeatedly agreed that recent scientific articles could be properly used for this purpose. (Tr. 1145, 1152). Even articles as recent as 1981 could be used for proof of causation. (Tr. 1153, 1154). However, the Court ruled that later warnings could not be mentioned because any testimony as to change in the warnings, would be inadmissible, subsequent, remedial measures proscribed by Fed.R.Evid. 407.

The Court finds occasional references to post-1976 warnings in violation of a stipulation in Chambers that plaintiffs' counsel would not mention to the jury the present warnings contained in package inserts.[8] Counsel for plaintiffs was admonished by the Court (Tr. 1049, 1050, 1145) and Ortho's objections were repeatedly sustained. Furthermore, most questions directed to Drs. Pasquale and Braun on the subject of post-1976 events concerned medical literature which went to the very heart of the causation issue.

The Court agrees with plaintiffs' counsel when he stated on the record (Tr. 1040), but out of the hearing of the jury,

If smoking along with the pill has a synergistic effect, the combination of which increases the risk of stroke, just because that became apparent, according to Ortho, after her stroke, that doesn't mean that the smoking she was engaged in and the birth control pill ingestion she was engaged in before didn't cause her stroke. Now if counsel is willing to abandon the issue of causation, fine. If counsel is not, your honor, then I cannot be

---

7. Two leading researchers in the field of oral contraceptives whose articles appear in prestigious and respected medical journals and acknowledged by all expert witnesses as authoritative scientists.

8. The present warnings do contain references to smoking.

handcuffed in presenting, showing this jury that the causation aspect of this case has, in fact, been crystallized by the subsequent literature.

Later, counsel for Ortho agreed that if his adversary's witness chooses "to ferret out the words that are currently in the package insert without saying they are from our current package insert, that's fine; he can do that. But he can't mention that they are in our current package insert." (Tr. 1049).

At the time that counsel for plaintiffs brought out post-stroke warnings in his questioning of witnesses, when he was delving into the causation issue, the Court sustained Ortho's objections, but refused to grant a mistrial. We see no reason to grant a new trial on the basis of these questions. In *Lindsay v. Ortho Pharmaceutical*, 637 F.2d 87 (2d Cir. 1980), the Court concluded that the admission of post-stroke warnings was prejudicial because it was compounded by the trial judge's instruction to the jury that it might consider post-stroke warnings in determining whether Ortho's warnings to doctors were adequate. The instant case is clearly distinguishable because *this Court did not permit post-stroke changes in warnings to be considered by the jury.* The offending questions were not allowed by the Court to be answered by the witness and at no time was the jury told exactly what words are utilized in the present warnings, in regard to smoking.

The evidence admitted and referred to constantly in the case centered around the language on the dialpak (container of pills), the Physicians' Desk Reference and package inserts from 1969, when Mrs. Skill started a regimen of oral contraceptives, until August 1976 when she stopped. Furthermore, even if error could be found, the admissibility or exclusion of evidence is discretionary with the trial court and will not be disturbed on appeal unless clearly erroneous. *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144, 1153 (10th Cir. 1978).

The defendant must bear in mind that the burden of proof on a motion for a new trial is on the movant, and the Court must be guided by a common sense approach. *Anglo-American General v. Jackson Nat. Life Ins.*, 83 F.R.D. 41 (N.D.Cal.1979).

"In deciding a motion for a new trial, the court must insure that there is no miscarriage of justice, but at the same time, it must respect a plausible verdict." *Kerry Coal Co. v. United Mine Workers of America*, 488 F.Supp. 1080 (W.D.Pa.1980), *aff'd* 637 F.2d 957 (3d Cir. 1981); *see also Wright & Miller, Federal Practice & Procedure* § 2809 at 49.

In light of the voluminous amount of evidence adduced at trial upon which the jury could have reasonably relied when it found liability, the errors complained of by the Ortho were not prejudicial and, therefore, would not constitute a proper basis upon which to grant a new trial. *Smith v. Southeastern Stages, Inc.*, 479 F.Supp. 593 (N.D.Ga.1977). Moreover, any error had it occurred, would have been cured by the Court's charge when it instructed the jury that the relevant time period for warnings was 1968 to 1976. (Tr. 2516).

## V.

### *Admission of Adverse Reaction Reports*

Defendant's fifth contention is that the admission of adverse reaction reports constituted prejudicial error. Adverse reaction reports, or "drug experience reports", as Ortho's Director of Medical Research preferred to call them (Tr. 1248), emanate from doctors around the United States and other countries whose patients suffered from side effects, such as the cerebral vascular accident experienced by Margaret Skill after using Ortho-Novum.

In an opinion filed April 6, 1981, this Court denied Ortho's motion *in limine* to bar these reports. However, the Court ruled that it would be prejudicial and cumulative to allow the sixty (60) reports into evidence that plaintiffs had listed in the pretrial order. The Court held that the jury should not be denied the opportunity to take into consideration ten (10) representative adverse reaction reports in deter-

mining the adequacy of the warnings by Ortho. The rationale for this decision was that under § 402A of the Restatement (Second) of Torts, substantially adopted by the State of New Jersey, the failure to adequately warn of a *known* danger would lead to a conclusion that a manufacturer breached its duty. *See* Comments (j) and (k) of § 402A; *Torsiello v. Whitehall Laboratories,* 165 N.J.Super. 311, 322, 323, 398 A.2d 132 (App.Div.1979), *cert. denied,* 81 N.J. 50, 404 A.2d 1150 (1979). Consequently, the adverse reaction reports were admitted to illustrate Ortho's knowledge of the dangerous character of the drug and the necessity of giving proper warnings. Although this Court allowed plaintiffs' counsel to utilize ten reports, he actually used only three out of what was described during oral argument on the motion *in limine* as a "roomful" of adverse reaction reports. He used the three reports in his examination of Dr. Pasquale when he explored what Ortho did when it received these reports. The three reports objected to by Ortho were submitted during the time Dr. Pasquale was Director of Medical Research. (Tr. 1248). The reports were used only in the context of examination of Dr. Pasquale, and were not evidence taken into the jury room during deliberations. An example of how the reports were utilized on examining Dr. Pasquale follows:

Q. I would like to analyze them a little bit with you, Doctor, and ask you what you did as a result of receiving these adverse reaction reports, what significance you may have given them or may not have given them. (Tr. 1248).

Further along in his examination of Dr. Pasquale, counsel for plaintiffs added:

Q. Now, as a result of receiving this drug experience report, what did, if anything, did Ortho do? (Tr. 1253).

The report referred to in the last question was completely relevant to the issue of defective warnings since the patient had smoked one pack a day for eight (8) years and had a stroke after ingesting Ortho-Novum. (Mrs. Skill smoked one-half to one pack of cigarettes a day). (Tr. 150). It was a legitimate use of this report for plaintiffs' counsel to point out to the jury the fact that the patient had been a habitual cigarette smoker was not recorded in the Ortho's tabulations.

Q. So Ortho has kept, to the best of your knowledge, during the seven or eight years you were executive medical director, Ortho did not keep any record of drug experience reports among people who smoked?

A. No. (Tr. 1253).

The jury was entitled to hear that Ortho did not warn about smoking and the pill even after receiving these adverse reaction reports.

The Court concludes that the admission of the reports was not prejudicial and that the jury's finding that Ortho was culpable was plausible and not merely based on these three reports.

### VI.

#### *Causation*

The sixth argument advanced by Ortho is that the evidence presented was insufficient to support a finding of causation. The defendant claims there was no evidence that a woman could have a stroke five months after she stopped ingesting an oral contraceptive.

The Court, after thoroughly reviewing the record in this case, concludes that there was ample evidence for the jury to have found that Mrs. Skill's stroke was caused by using Ortho-Novum, in conjunction with smoking. As was enunciated earlier in this opinion, we can grant a new trial only when the verdict is palpably contrary to the clear weight of the evidence, or when a miscarriage of justice has occurred. *See Hild v. Bruner,* 496 F.Supp. 93 (D.N.J.1980); *Larsen v. International Bus. Machines Corp.,* 87 F.R.D. 602 (E.D.Pa.1980).

Dr. Strenger, a board-certified neurosurgeon and plaintiffs' expert witness on causation, who diagnosed and treated Mrs. Skill at the time of her stroke in January 1977, testified at length on the changes that occur in the blood vessels after ingesting

oral contraceptives, and how clots can form as a result thereof. He described the tests that were performed on Mrs. Skill during the course of her hospitalization in order to determine the cause of a stroke in such a young woman. (She was twenty-five years old at the time). The only predisposing factors found were her history of taking oral contraceptives and smoking. The fact that Mrs. Skill stopped taking the pill in August 1976 did not change Dr. Strenger's opinion that the pill was instrumental in causing the stroke in January 1977. (Tr. 1551). His diagnosis showed occlusive [9] disease of vessels of branches of the middle cerebral artery which resulted in a thrombotic stroke, also called a "cerebral thrombosis". (Tr. 1556). The jury had access to Mrs. Skill's medical records which stated "cerebral thrombosis, secondary to birth control pills". Dr. Strenger further testified that although the complete closure of the blood vessel happens suddenly, the causation occurs over a period of time. (Tr. 1615). He went into great detail about changes in blood vessels and platelets. He stated that with the use of the pill one can get an abnormality of clotting factors and spontaneous thrombosis or closure of blood vessels. Additionally, smoking and nicotine cause spasms of the blood vessels, slow down the normal flow of blood and can cause clotting. (Tr. 1618, 1619). The jury heard the following testimony which impacted on its verdict:

> In her situation, the combination of the two, in our opinion, were the two factors that we could identify that led to premature closing of this blood vessel in a 26 year old [10] individual where one would otherwise not expect it to close off.

> Now, quite admittedly you could have infantile strokes and other reasons involved, but these are the two factors that we found as probable causes in her situation. (Tr. 1619).

Counsel for plaintiffs then asked:

Q. Doctor, can you state to a reasonable medical certainty that the combination of smoking and the pill in this case caused this stroke?

A. This is our, the factors in determining this is the probable cause.

Q. You said, Doctor, before that it was in our opinion that these two things caused this stroke.

My question is, are you aware of a synergistic relationship between smoking and the pill?

A. Currently it said that the incidence of thrombolic phenomena is approximately five times in female smokers as it is in female non-smokers who are taking the pill. (Tr. 1621).

Counsel for Ortho in their memorandum imply that there is no way to discover to an absolute certainty that smoking and oral contraceptives caused the stroke in an otherwise healthy twenty-five year old. However, as Dr. Strenger testified, during argument out of the jury's presence, "[w]e cannot be 100 percent sure about the causation" without taking tissue from inside the brain. (Tr. 1603). On cross-examination counsel for Ortho stated, "So that without doing an autopsy on someone, you really can't be 100 percent sure what the cause is. Am I right?"

A. Without tissue to diagnose, you cannot be 100 percent sure. You have to have it under the microscope. (Tr. 1661).

According to counsel for defendant, no jury would be able to definitely link the pill, smoking and stroke unless the patient died. The Court certainly cannot follow this reasoning to its inevitably absurd and cynical conclusion.

Defendant argues that probabilities are not enough to prove causation. In *Johnesee v. Stop & Shop Cos.*, 174 N.J.Super. 426, 431, 416 A.2d 956 (App.Div.1980), the Court stated: "It is true that medical-opinion testimony must be couched in terms of reasonable medical certainty or probability; opinions as to possibility are inadmissible."

---

**9.** "Occlusive" is defined as a closing down of the blood vessel, i. e. it is smaller than it should be. (Tr. 1553).

**10.** Mrs. Skill was actually twenty-five at the time of the stroke in January 1977. Her date of birth was 3–6–51. (Tr. 123).

Perhaps defendant is confusing "probability" with "possibility"; the former is acceptable, the latter is not. Dr. Strenger talked in terms of "probabilities" not "possibilities". (Tr. 1603, 1621). The jury believed him and this Court is not at liberty to reject the jury's determination. The plaintiffs' burden was to prove by a reasonable medical probability what caused the injury. The defendant was free to rebut any such proof by medical evidence negating the claimed cause. It failed to offer convincing rebuttal to the jury's satisfaction. This Court will not tamper with the result.

## VII.

*Violation of Basic Trial Practice Rules*

■ Ortho complains that plaintiffs' counsel violated basic rules of trial practice, thereby prejudicing it and requiring a new trial.

The Court is ever mindful that counsel are advocates and, in keeping with our adversarial system, should vigorously represent their clients to the very best of their abilities. Unfortunately, however, there are times when counsel overzealously step beyond the bounds of legal propriety and exceed the limits of good trial practice. We believe that these limits were exceeded, at times, by both counsel.

The trial of this case was marked by acrimonious and vituperative behavior of counsel. The record cannot adequately reflect the pervasive bitterness that was apparent between the adversaries. As in *Corbett v. Borandi*, 375 F.2d 265 (3d Cir. 1967), this Court is uniquely aware of the atmosphere that permeated the trial. At times, the conduct of counsel would have tried the patience of Job, let alone that of this Court. Although plaintiffs' counsel did, on some occasions, breach basic rules of trial practice, it is not entirely accurate for defendant counsel to recite a one-sided litany of what is termed "unfair tactics" by his ad-

versary. This may very well be a situation where the proverbial "pot is calling the kettle black." The Court is not going to engage in a lengthy, detailed discussion of every instance of plaintiffs' counsel's alleged improprieties. We are not going to become involved in an evaluation of "Comparative Fault."

As stated in *Corbett, supra,* "the trial judge is in a far better position . . . to evaluate the effect of any statement on the jury." We cannot say that the alleged violations were so injurious as to constitute prejudice warranting the grant of a new trial.

### B. *Ortho's Motion for Judgment Notwithstanding the Verdict.*

#### I.

*Adequacy of Ortho's Warnings as a Matter of Law*

■ Ortho contends that its warnings concerning the risk of stroke in oral contraceptive users were adequate as a matter of law, and therefore judgment n. o. v. should be granted under Fed.R.Civ.P. 50(b). As discussed earlier in this opinion, when all the evidence is considered, together with all reasonable inferences which may be drawn therefrom most favorably to the plaintiffs, there must be total failure or lack of evidence to prove a necessary element of the plaintiffs' case for such a motion to succeed. *Lewin v. Metropolitan Life Insurance Co.,* 394 F.2d 608, 613 (3d Cir. 1968).

The Court agrees with Ortho that its warnings as to the possibility of a stroke were adequate. Even plaintiffs' expert on adequacy of warnings, Dr. Goldstein, conceded this point. (Tr. 1791, 1792). However, the crux of this case concerns the warnings as to *smoking,* the pill and the risk of stroke.[11] When Ortho cites a myriad of cases for the proposition that package inserts, identical to the ones at issue in this case, have been held to be adequate as a matter of law, it overlooks this crucial point. None of the cited cases involved

11. Plaintiffs also raised the issue that Ortho should have warned that women with certain blood types were at greater risk of stroke than others. Since the jury rejected this, there will be no further mention of the blood type issue.

women who ingested oral contraceptive in conjunction with smoking.[12]

It is undisputed that during the relevant time period Ortho issued *no* warnings to physicians or anyone else concerning the possible risk associated with smoking while taking Ortho-Novum.

Ortho argues that the medical literature did not support the jury's finding that the drug company should have warned of this risk. It opines that it is not sufficient for respected scientists to indicate that the risk of stroke is greater when pills are taken combined with smoking, because those scientists also say they would like larger samples. The basic question the jury had to answer boiled down to this: Was there sufficient knowledge, at the relevant time, of danger inherent in taking the pill while smoking to warrant Ortho's giving proper warnings in this regard? The jury answered "Yes" and the Court cannot quarrel with that answer. The jury had enough evidence to conclude there was greater risk of stroke when a woman smoked and took "the pill" than when she just smoked, or just took "the pill." (Tr. 1902–1907, 1777, 1784, 1805, 1807).

The Court concludes, viewing all the evidence together with all possible inferences in a light most favorable to plaintiffs, that the jury had a sufficient basis to find that Ortho's warnings were inadequate for failing to mention smoking at all.

## II.

*Proximate Cause of Smoking and the Pill*

 Ortho next argues that assuming the warnings to the prescribing physician, in this case Dr. Martinez, were inadequate, there was no proof to indicate that this defect was the proximate cause of Mrs. Skill's injury. Ortho suggests that even if it had included a warning about smoking in the package inserts, Dr. Martinez might not have communicated that warning to Mrs. Skill. This is sheer speculation. It bases this surmise upon the testimony of Mrs. Skill that Dr. Martinez never warned her about *any* of the other side effects, including stroke, which Ortho did warn about in the package inserts. However, Dr. Martinez testified that he was unaware, from 1969 to 1976, of a relationship between smoking, the pill and strokes, which information would have proved useful had he known it. Furthermore, the jury could have reasonably concluded that had Dr. Renza, her treating physician, known of the risk, he would have taken her off Ortho-Novum sooner than he did when she started to exhibit symptoms such as headaches.[13]

The jury was confronted with the acknowledged fact that there were no warnings at all to anyone regarding smoking.

Therefore, this Court rejects the argument that the warnings were adequate, as a matter of law.

## III.

*Inconsistencies of Plaintiffs' Theories*

 Finally, Ortho contends that the judgment should be set aside because the plaintiffs' theory of causation is inconsistent with their theory of inadequate warnings. Ortho asserts there was no duty to warn a woman who smoked that *former* use of oral contraceptives could be hazardous. During the trial of this case, the issue of former use of contraceptives was centered around causation. Dr. Strenger testified as to the issue of discontinuance, and the effect on the blood vessels of former use.

The relevant time frame, as this opinion has reiterated, was from 1969 when Mrs. Skill began ingesting Ortho-Novum until

**12.** *Chambers v. G. D. Searle & Co.*, 441 F.Supp. 377 (D.Md.1975), *aff'd*, 567 F.2d 269 (4th Cir. 1977); *Magill v. G. D. Searle & Co.*, Civ. No. 72–1118 (E.D.Pa. May 15, 1975), *aff'd*, 535 F.2d 1247 (3d Cir. 1976); *Goodson v. Searle Laboratories*, 471 F.Supp. 546 (D.Conn.1978); *Dunkin v. Syntex Laboratories, Inc.*, 443 F.Supp. 121 (W.D.Tenn.1977).

**13.** Although Dr. Renza testified that he never prescribed the pill for Mrs. Skill, he was aware of her use of said pill from another doctor's prescription. The jury believed Dr. Renza when he was totally exonerated by the jury.

1976 when she stopped taking the pill on the advice of Dr. Renza. To bring up *former* use and discontinuance in connection with warnings begs the two-part operative question in this products liability case: Were there adequate warnings concerning smoking, the pill and stroke, based on Ortho's knowledge at the time Mrs. Skill was on Ortho-Novum; if the warnings were inadequate did this defect cause the stroke? Any other question is irrelevant and unnecessarily muddies the waters of an already complicated case.

For all of the foregoing reasons, the motion of defendant, Ortho Pharmaceutical Company, for a judgment notwithstanding the verdict, or, in the alternative, for a new trial is denied.

### C. *Plaintiffs' Motion for Judgment Notwithstanding the Verdict*

■■■ Plaintiffs argue, in their memorandum in support of their motion for judgment n. o. v., that there was no basis upon which the jury could impose liability upon Dr. Martinez. They request that the Court strike the verdict against Dr. Martinez and enter judgment against Ortho solely for the full amount as determined by the jury.

We will not repeat the legal standards of judgment n. o. v., already enunciated earlier in this opinion. Suffice it to say that we find no merit in plaintiffs' contention since there is sufficient, competent evidence to support the jury's verdict against Dr. Martinez and Ortho.

■■■ The plaintiffs do not meet the prerequisite under Fed.R.Civ.P. 50(b), i. e. a motion for judgment n. o. v. may be entertained only if the movant had moved for a directed verdict at the close of all the evidence. *See* Fed.R.Civ.P. 50(b); *DeMarines v. K.L.M. Royal Dutch Airlines*, 580 F.2d 1193, 1195 n.4 (3d Cir. 1978); *Lowenstein v. Pepsi Cola Bottling Co. of Pennsauken*, 536

F.2d 9, 10 (3d Cir. 1976) [14], *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976).

Furthermore, even if plaintiffs had complied with the mandates of Rule 50(b), their motion would still fail. The special interrogatory submitted to the jury, concerning Dr. Martinez's negligence, reads as follows: "Was Dr. Martinez negligent in failing to adequately warn Margaret Skill of risks associated with the use of Ortho Novum, and was this negligence a proximate cause of Margaret Skill's injury?" The jury answered affirmatively. Plaintiffs raised no objection to this interrogatory at trial; on the contrary, plaintiffs' counsel spent considerable time, prior to the settlement with the doctors, attempting to prove the very negligence, the finding of which he objects to now.

Ironically, plaintiffs argue at this late date that expert testimony should have been produced in order to prove Dr. Martinez's negligence. However, plaintiffs did not object to the Court's charge to the jury that a physician has a duty to inform his patient of risks when prescribing drugs (Tr. 2517–18) and that in certain cases, such as this one, there is no need for expert testimony. (Tr. 2512–13). *See Calabrese v. Trenton State College*, 162 N.J.Super. 145, 392 A.2d 600 (App.Div.1978), *aff'd*, 82 N.J. 321, 413 A.2d 315 (1980). Plaintiffs contend that *Calabrese* stands for the proposition that there is an exception to the requirement of expert testimony only when the physician fails to warn of *known* risks. However, evidence was presented to the jury that revealed a complete absence of *any* warning at all issued by Dr. Martinez to Mrs. Skill regarding oral contraceptives. Not only did he fail to warn her of the danger of smoking combined with the pill, which was *unknown* to him, but he failed to warn her of any adverse side effects whatsoever. Dr. Martinez testified that he

**14.** Some courts have recognized limited exceptions to the Rule 50(b) requirements in certain instances where: (a) there has been substantial, if not literal, compliance with the rule; (b) where manifest injustice will otherwise occur since the verdict is totally without legal support; (c) where the trial judge in effect excused the failure to renew the motion; and (4) where the additional evidence was brief and inconsequential. *Smith v. University of North Carolina*, 632 F.2d 316, 339 (4th Cir. 1980). None of these exceptions are applicable to the instant case.

warned Mrs. Skill of risks associated with the pill. (Tr. 782). Mrs. Skill testified otherwise. Obviously, in evaluating the credibility of the witnesses, the jury chose to believe Mrs. Skill. Additionally, the doctor's credibility was damaged when it was brought out by plaintiffs' counsel that, in answering the interrogatories during discovery, Dr. Martinez never mentioned that he had prescribed Ortho-Novum or any other oral contraceptive for Mrs. Skill. (Tr. 885, 886). Despite this omission, Dr. Martinez testified on the stand that he remembered clearly the conversation he had with Mrs. Skill about the risks of Ortho-Novum.

The jury was acting reasonably and within its province as fact-finder when it chose to believe Mrs. Skill and not Dr. Martinez.

The Court concludes that plaintiffs are not entitled to a judgment n. o. v. and their motion shall be denied.

### Conclusion

This Court has reviewed the motions for judgment n. o. v. made by both defendant Ortho and plaintiffs, and has concluded, for the foregoing reasons, that the evidence was sufficient for the jury to find that Ortho Pharmaceutical Company and Dr. Martinez were jointly liable for Mrs. Skill's injury.

The Court has also examined the motion for a new trial made by Ortho, alleging that the verdict was against the weight of the evidence and that there were prejudicial errors in the conduct of the trial. The Court concludes that if any errors were committed they were harmless in nature, and that the verdict was a plausible and permissible one.

### ON MOTION FOR REHEARING

■ On August 17, 1981, this Court filed its opinion, in this products liability-malpractice action, ·denying defendant Ortho Pharmaceutical Co.'s motion for a judgment notwithstanding the verdict or, in the alter-

native, a new trial. Plaintiffs also filed a motion seeking revision of the jury's verdict which motion was likewise denied. Thereafter, on August 28, 1981, defendant Ortho filed a motion for a rehearing on that portion of the Court's opinion regarding a communication from the jury addressed to the Court. *See, Skill v. Martinez,* No. 78–2893 (D.N.J. filed August 17, 1981). Plaintiffs maintain that this latter motion is untimely. Although not clear from the notice and supporting memorandum, inquiry by the Court of defense counsel disclosed that they were proceeding under Rule 12(I) of the General Rules for the District Court of New Jersey, which states:

I. A motion for re-argument shall be served and filed within 14 days after the filing of the court's order or judgment on the original motion. There shall be served with the notice a memorandum, setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. *No oral argument shall be heard unless the court grants the motion and specifically directs that the matter shall be re-argued orally.* (emphasis supplied).

As is required by Rule 12(I), the defendant filed its motion for a rehearing[1] within 14 days after the filing of the Court's order on the original motion. Thus, the defendant's motion was timely and will be considered by this Court. However, it will be considered solely on the proceedings presently on file. The Court finds oral argument, allowed under the cited rule only if specifically granted by the Court, is unnecessary in this particular matter.

■ At the very outset, it must be noted that after the defendant filed the instant motion for rehearing on August 28, 1981, it also filed, on September 16th, 1981, a Notice of Appeal with the Third Circuit Court of Appeals. As a general rule, the filing of a Notice of Appeal divests the district court

---

1. Although defendant's motion is entitled a "Motion for Rehearing", a motion brought pursuant to Rule 12(I) is properly captioned a "Motion for Re-argument." However, in order to be consistent with the language of the motion and memorandum in support thereof, this Court will refer to it as a motion for rehearing.

of jurisdiction and transfers it to the court of appeals with respect to any matters involved in the appeal. *Securities Exchange Commission v. Investors Security Corp.*, 560 F.2d 561, 568 (3d Cir. 1977). Notwithstanding this general rule, the district court may retain limited jurisdiction over the matter being appealed if the district court's action will assist the court of appeals in its ultimate determinations. 9 Moore's Federal Practice ¶ 203.11 (2d ed. 1980); *Hovey v. McDonald*, 109 U.S. 150, 157, 3 S.Ct. 136, 140, 27 L.Ed. 888 (1883); *Securities Exchange Commission v. Investors Security Corp.*, 560 F.2d at 568; *United States v. Lafko*, 520 F.2d 622, 626 (3d Cir. 1975); *State of New York v. Nuclear Reg. Com'n.*, 550 F.2d 745, 754, 758 (2d Cir. 1977).

■ Insight into resolution of the jurisdictional issue is provided by an examination of the relief sought in Ortho's motion for a rehearing. It is requested that this Court grant either of two alternative forms of relief. First, the defendant submits that certain findings of the Court set forth in its August 17th opinion are erroneous and requests that we adopt the findings that it proposes in lieu of those contained in the Court's opinion. Second, the defendant submits that if its proposed findings are not adopted, then the Court should have the Chief Judge of this Court order a plenary hearing before another judge of this or another district to resolve the conflict between its factual contentions and the findings of fact made by this Court.

After careful consideration of the defendant's instant motion, we conclude that it is advisable for this Court to retain such jurisdiction, countenanced by the heretofore cited authorities, as may assist the court of appeals in resolving the conflict between this Court's findings and those belatedly proposed by the defendant. No useful purpose would be served by allowing the defendant a full hearing on this matter as such a proceeding would only provide another forum for the defendant's continuing and repetitive attack upon this Court's findings of fact. This Court's views are contained in the trial transcript (2558–71), again in its prior opinion, *see Skill v. Martinez*, at 504–506, and for the third time, briefly but of necessity, in this opinion. The Court reiterates its factual findings with full awareness that the issue of any alleged error is one which must ultimately be resolved by the court of appeals.

Plaintiff, Margaret Skill and her husband, Arthur J. Skill, Jr., instituted this action initially against B. G. Martinez, M.D., Richard Renza,, M.D.[2], and Ortho Pharmaceutical Co., maintaining that Mrs. Skill sustained a cerebral vascular accident, commonly known as a stroke, resulting from her ingestion of an oral contraceptive pill manufactured by the defendant Ortho, in conjuction with cigarette smoking. Following the Court's charge on April 23, 1981, at 1:45 P.M., the jury began its deliberations. At 5:00 P.M. the jurors were dismissed, reconvening 9:20 A.M. the next day.

■ Shortly, after the second day of jury deliberations had begun, the Court received a note from the jury. At that time counsel for plaintiffs were present, but counsel for defendant were not.[3] As the August 17th opinion indicates, the note from the jury posed the question: "What about Ovulen-21? Is this a birth control pill or does it control ovulation?" *Skill v. Martinez*, No. 78–2893, at 504. A record of

---

**2.** On the fifth day of the trial, the defendants B. G. Martinez, M.D., and Richard Renza, M.D. settled the claims against them.

**3.** Ortho was represented by Robert Sparks, Esquire, admitted pro hac vice. Without informing the Court, Mr. Sparks absented himself on the second day of jury deliberations. The effect of his voluntary absence is examined in the opinion on defendant's original motion. *Skill v. Martinez*, at 504. Pursuant to District Court of New Jersey General Rule 5, Jeanne Taylor, Esquire, served as local counsel in this matter. Ms. Taylor explained her absence as being the result of the mechanical failure of her automobile. *Id.* at 504. Although Ms. Taylor did not participate in the actual trial defense of defendant, this opinion proceeds in part by assuming, arguendo, that Ms. Taylor can be considered counsel for defendant.

the Cape May County Health Department indicated that plaintiff was given a one month prescription of Ovulen-21. (Tr. 267). When cross-examined on the contents of this hospital record, plaintiff testified that she had taken Ovulen-21 for one month, two years before her stroke. Defendant never made an assessment of plaintiff's use of Ovulen-21. There was not one further word of testimony concerning Ovulen-21, nor was the manufacturer of this drug ever made a party to this suit by either the plaintiffs or the defendants.

The Court was thus confronted with the simple task of responding to the jury's irrelevant question in a manner which would spare the defense any possibility of prejudice. The Court could have replied to the inquiry by stating that the question could not be answered because defense counsel were unavailable or by having the jury return to the courtroom for further instructions. In either case, the jury would have become aware of the absence of defense counsel. Alternatively, the Court could have waited until counsel for defendant arrived before responding to the question. However, any of these alternatives could well have resulted in the jury being prejudiced against the defendant's case. Therefore, the Court rejected those options and instead immediately answered the question by stating that, "This is just another birth control pill that has nothing to do with this case." Under the circumstances existing at that time, the Court is of the view that its response was the most reasonable.

When local counsel for defendant arrived, the Court explained what had occurred and she approved of the Court's action. Twenty minutes later, but one and a half hours after the jury's communication was received, counsel changed her mind and objected to the Court's response. A record of these events was then made, in which counsel objected to the Court's instruction and the Court reaffirmed its initial action, refusing to recharge the jury. Note that in the findings proposed by the defendant, it is suggested that local counsel did not approve of the Court's action when first informed of the jury communication. However, the record discloses the statement the Court made to local counsel, "I told you what the note was and I told you what my response was and I asked you whether that was all right with you and you told me yes." (Tr. 2569). Logic would dictate that if local counsel did not agree with this statement she would have objected immediately, but she did not do so.

 We now turn to the defendant's motion for a rehearing. This motion is in reality an attempt to reargue basically the same claims made by the defendant in its motion for a judgment notwithstanding the verdict, or, in the alternative, a new trial. However, in the instant motion, Ortho presents the additional claim that the Court's findings set forth in the August 17th opinion were erroneous. Defendant requests that this Court adopt its proposed findings of fact in lieu of those stated in the Court's opinion of August 17th. However, the Court's findings as to what had occurred on that day were known to the defendant's counsel prior to its original motion. (Tr. 2556–71). As previously stated, local counsel could have objected on the record to the Court's recollection of her initial reaction to the jury communication, but failed to do so. Additionally, if defendant's counsel were of the view that the Court's findings were erroneous, they had the opportunity to request oral argument on their original motion to resolve any conflict at that time. Counsel had the choice then to clarify any discrepancies between this Court's version and counsel's, but opted to waive oral argument. Instead, only after defendant's original motion was denied did counsel challenge the Court's findings. In any event, review of the record reveals that the findings contained in the Court's August 17th opinion accurately reflect what occurred on the day in question. This Court, therefore, refuses to adopt the findings of fact proposed by the defendant.

As aforementioned, except for the claim that the Court's factual findings were erroneous, this motion presents basically the same claims that were presented in defend-

ant's original motion. Defendant even cites the same cases in support of this motion as were heretofore cited, with the exception of *Hartol Petroleum Corp. v. Cantelou Oil Co., Inc.*, 107 F.Supp. 373 (W.D.Pa.1952). Because this case is mentioned for the first time in defendant's instant memorandum, discussion is warranted.

Defendant relies upon *Hartol* to support its claim that this Court erred by not making a record of the note and response at the exact moment the response was made. But the decision in *Hartol* does not support such a position. Instead, *Hartol* is supportive of the proposition that when the jurors, after having begun deliberations, present a question to the Court, and that question requires no discussion, a record must be made of the note and the Court's answer, and counsel for both parties must have an opportunity to object. *Id.* at 375.

In the instant case, however, a record was made of the note and the Court's response thereto. Although the record was actually made shortly after the answer was returned to the jury, the accuracy of the recording of the contents of the note and the judge's response are not in issue here. Counsel for defendant never asked to see the note nor did she challenge the accuracy of the Court's recollection, or that of plaintiff's counsel, regarding the contents of the note. The fact that, as was later learned, the note was inadvertently destroyed by the jury should, therefore, not affect the outcome of this motion. The issue raised by the defendant is whether counsel had an adequate opportunity to object. Clearly, she was afforded such opportunity and in fact did object. (Tr. 2559). The Court then reiterated that the jury's question was irrelevant and that the Court's answer thereto would not be changed. (Tr. 2567–71).[4]

As for the alternative relief sought by the defendant by way of this motion, i.e. a plenary hearing, retention of limited juris-

diction to decide this issue is not technically necessary to assist the court of appeals. However, it would be difficult for this Court to refrain from expressing its view and to ignore the ramifications of the defendant's request.

■ In the second part of defendant's motion, it is submitted that if this Court does not adopt the findings proposed by the defendant in lieu of those made in the Court's original opinion, then we should have the Chief Judge of this Court order a plenary hearing before another judge of this or another district to resolve the conflict between the factual contentions of the defendant and the findings made by this Court. Defendant cites as authority for this unprecedented proceeding the American Bar Association Code of Judicial Conduct Canons 2 and 3. Canon 2 pertains to the avoidance by a judge of impropriety and the appearance of impropriety in all his activities. Canon 3 pertains to the performance by a judge of the duties of his office impartially and diligently. Even a strained interpretation of either Canon would not provide authority for the plenary hearing sought by the defendant.

■ Furthermore, defendant claims that pursuant to 28 U.S.C. § 455(b)(1), this Court should disqualify itself from hearing the motion because of its personal knowledge of disputed evidentiary facts. However, this statute does not support the defendant's position. It states, in pertinent part, that a judge shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceedings[.]" Contrary to what is implied by defendant, a judge need only disqualify himself when the knowledge is obtained from an *extrajudicial source*. *United States v. Winston*, 613 F.2d 221, 223 (9th Cir. 1980). "Knowledge obtained in the

---

4. *Cf. Arrington v. Robertson*, 114 F.2d 821 (3d Cir. 1940) (where no record at all of the jury's question was made). In *Arrington*, the court found the failure to record the jury's question reversible error because the appellate court was unsure of the phraseology of the question

and hence unable to determine the propriety of the trial court's answer. *Id.* at 823. In the case presently before this Court, the phraseology of the jury's question is not in issue. The defendant merely claims that the Court gave the wrong answer and objects thereto.

course of earlier participation in the same case does not require that a judge recuse himself." *Id.* The Court's knowledge, in the instant case, was acquired solely through its involvement with the trial.

In support of its position that Section 455(b)(1) applies, defendant cites *United States v. Mirkin*, 649 F.2d 78 (1st Cir. 1981). However, the decison in *Mirkin* involves disqualification of a judge under the part of section (b)(1) which pertains to a judge's "personal bias or prejudice." Assuming, arguendo, that defendant contends that this Court is biased or prejudiced against it, or assuming that the defendant intends to apply *Mirkin* by analogy, the decision is still inapposite to the defendant's position.

In *Mirkin*, the defendant in a tax evasion case appealed from the denial of his motion for a new trial based on an allegation of juror misconduct. On appeal he argued, in part, that the trial judge should have disqualified himself from hearing the motion, pursuant to 28 U.S.C. § 455(b)(1), because of his bias or prejudice against the defendant. The court of appeals affirmed the trial court concluding that disqualification for "personal bias or prejudice", like disqualification for "personal knowledge", requires that the bias or prejudice stem from an *extrajudicial source. Id.* at 81. Similarly, in the present matter, any opinion held by this Court could only have been based on what was observed during the course of the proceedings.

The other cases cited by defendant in its reply memorandum are equally unpersuasive. In *United States v. Halley*, 240 F.2d 418 (2d Cir. 1957), the defendant appealed from the denial of his motion in the nature of *coram nobis* to vacate a prior judgment of conviction and sentence. The motion had been heard by the judge that had presided at the time of plea and sentence. The defendant claimed that the trial judge had not advised him of his right to counsel. The Court did not believe the defendant's claim and denied the motion. The Second Circuit Court of Appeals affirmed. In dicta, the court of appeals added that under ordinary circumstances many *coram nobis*

"proceedings involve issues as to which the judge of the sentencing court may be a material witness . . . . [Consequently, we] suggest the advisability of having such applications heard before some district judge other than the judge . . . who presided at the time of plea and the time of sentence." *Id.* at 419.

In *Tyler v. Swenson*, 427 F.2d 412 (8th Cir. 1970), the relevant portion of the decision held that when a state court judge also sat as the judge in a post-conviction hearing and relied upon his own recollection as the only evidentiary basis for denying the relief sought, the federal court in a habeas corpus proceeding should have granted an evidentiary hearing or given the state court the opportunity to entertain the petitioner's claim in a new evidentiary hearing before another judge. The court reasoned that "[a] member of the judiciary has no particular competence in factual recollection of unrecorded events . . . [and a] party should be permitted to test a judge's recollection . . . ." *Id.* at 415. (emphasis supplied).

Both cases are clearly distinguishable from the case at bar. This Court is not relying on its own recollection of unrecorded events, but on the transcript made at the time of the jury communication. In addition, defendant had the opportunity to test the Court's version of what occurred both at the time the transcript was made and at the time of the original motion, but refused to do so.

As the above discussion indicates, the Judicial Conduct Canons 2 and 3, 28 U.S.C. § 455(b)(1) and the cited criminal cases provide no support for defendant's claim that this Court must disqualify itself from hearing this motion. In any event, compliance with the defendant's novel request would establish an undesirable precedent. If a plenary hearing were granted under the facts of this case, then every time the court's view of the facts differed from that of counsel, a hearing would be required placing the court on the witness stand and having another judge determine the issue of credibility between the court and counsel. Such unseemly action would invariably

undermine the legal system as it exists today.

This entire incident has been inflated beyond comprehension. In essence, defendant's motion involved the challenge of a minor incident in which the Court, in the absence of defense counsel, answered an irrelevant question that the jury communicated to the Court during its deliberations. Upon denial of the defendant's motion for a judgment notwithstanding the verdict or, in the alternative, a new trial, defendant filed the instant motion for a rehearing in which the very same incident is questioned and which has been characterized by plaintiff's counsel as an *ad hominem* attack upon this Court. We have determined that the current motion, like the defendant's original motion, is without merit and should be denied.