165 N.J. Super. 311 (1979)
398 A.2d 132
GERALD TORSIELLO AND CARMEN TORSIELLO, PLAINTIFFS-APPELLANTS,
v.
WHITEHALL LABORATORIES, DIVISION OF HOME PRODUCTS CORPORATION, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 25, 1978.
Decided January 23, 1979.
*315 Before Judges CONFORD, PRESSLER and KING.
Mr. Andrew P. Napolitano argued the cause for the appellants (Messrs. Vaccaro, Osborne & Curran, attorneys).
Mr. David A. Weglin argued the cause for the respondent (Mr. Elliott N. Fabricant, attorney).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff Gerald Torsiello took eight Anacin tablets a day for 14 months for relief of the pain of arthritis. This prolonged period of daily use ended when he suddenly suffered gastrointestinal hemorrhaging, ultimately diagnosed as "GI bleeding secondary to aspirin gastritis." He brought this action against defendant Whitehall Laboratories, the manufacturer of Anacin, relying on its alleged failure to have given adequate warning of this inherent danger of prolonged use of the product. He appeals from the involuntary dismissal of his action at the close of his proofs. Thus, this products-liability appeal raises the question, not heretofore addressed in a reported case in an American jurisdiction, of the legal adequacy of the customary manufacturer's warning regarding the use of a non-prescription aspirin product. There is a subsidiary question here raised. If the warning is in fact inadequate, is the manufacturer exculpated from liability by reason of the failure of a physician, subsequently *316 consulted by the user of the product, to have given the patient a proper warning against prolonged use? We hold that these are both jury questions, and hence that the trial court erred in dismissing this action at the end of the plaintiffs' case.
Accepting as true all of the evidence supporting the claim and according thereto all favorable inferences deducible therefrom, see Dolson v. Anastasia, 55 N.J. 2 (1969), the facts projecting these legal issues, as adduced through the testimony of plaintiff and his expert medical witness, are as follows: In December 1973 plaintiff Gerald Torsiello (his wife sues per quod) while on his way to work slipped and fell, apparently exacerbating a preexisting osteoarthritis of the right hip and injuring his right knee as well. He continued on his way, however, consulting the plant physician, a Dr. Hunziker, on his arrival. Various ameliorative measures including cold compresses followed by heat applications were prescribed as well as various prescription analgesics. These remedies failed to afford plaintiff any substantial relief from his pain, and some weeks later, towards the end of January 1974, he purchased a bottle of Anacin, a product manufactured by defendant, Whitehall Laboratories, after hearing it extolled in a television commercial as affording relief of arthritic pain. Before taking the Anacin, however, he read the label, which recommended a dosage not exceeding eight tablets a day and contained this warning:
CAUTION  If pain persists for more than 10 days or redness is present, or in arthritic or rheumatic conditions affecting children under 12 years of age, consult a physician immediately.
He commenced taking the recommended dose, obtaining noticeable pain relief.
When plaintiff next saw Dr. Hunziker, he asked him if he could continue to use the product as it had afforded him relief. Dr. Hunziker told him that it was undoubtedly the aspirin component of the Anacin which was having the *317 analgesic effect and that if it worked for him be could continue to take it. Plaintiff apparently saw Dr. Hunziker about 13 times over a period of approximately seven weeks for the sequelae of the fall and frequently requested and obtained from him reassurance as to the Anacin usage. Following his discharge from Dr. Hunziker's care, probably sometime in late winter or early spring 1974, plaintiff continued to take the recommended dosage of Anacin, ingesting between six and eight tablets daily. In so doing he relied on the label directions, assuming that no danger inhered in his use of the product so long as he did not exceed the recommended daily dosage. In March 1975, some 14 months after he had begun this daily Anacin regimen and approximately a year after he had last consulted Dr. Hunziker, he suffered an attack of gastrointestinal hemorrhaging resulting in a two-week hospitalization and an additional two-week convalescence at home. This action is to recover the damages thus sustained.
Plaintiff's expert witness, Dr. Rowland D. Goodman, an internist, opined that the gastrointestinal hemorrhage was caused by plaintiff's prolonged ingestion of the aspirin component of the Anacin.[1] Each Anacin tablet, he explained, consists of 400 milligrams of aspirin and 32 milligrams of caffeine, the aspirin components being, in weight, some one-third greater than a plain aspirin tablet, which typically contains 300 milligrams of aspirin. He further explained that the salicylate compound which is the analgesic component of aspirin is, as a matter of medical and pharmaceutical knowledge, recognized as a gastrointestinal irritant and despite the inclusion of an anti-irritant component in *318 aspirin, a significant number of people using aspirin over a long period of time develop gastrointestinal bleeding as the result of the continuing direct irritating effect of the salicylate compound on the membranes lining the stomach and intestinal tract.
The trial judge, in granting defendant's motion for involuntary dismissal, concluded that as a matter of law the sole duty of the manufacturer was to warn purchasers of the product not to use it for a period exceeding ten days without medical advice; that the extent of the manufacturer's duty did not include the obligation to warn consumers of any inherent dangers of the product, particularly those implicit in its prolonged use, and that in any event the dangers of prolonged use of aspirin products are commonly known to the consuming public. Thus, he reasoned that the warning here had proved adequate since it had achieved its exclusive legally-required objective of requiring plaintiff to consult a physician before continuing to use the product beyond a 10-day period. He also was of the view that any responsibility for plaintiff's harm was his own unreasonable use of the product or the fault of Dr. Hunziker or a combination of these two factors. We regard this thesis and each of the propositions on which it was predicated as legally untenable.
In dealing with the issues projected by this appeal, we address first the underlying legal theory which must govern their resolution. The action was pleaded both in ordinary negligence and, by asserting breach of warranty, in strict liability in tort. The trial judge considered the latter theory as exclusively applicable, and we are in full accord with his analysis in that regard. It is now clear that where actionable harm is alleged to have resulted from the use of a product distributed through the ordinary stream of commerce, the supplier's liability, if any, is appropriately predicated on the principles of strict liability in tort rather than upon either a negligence or contract cause of action as traditionally conceived. It is further clear that in respect *319 of the definitional scope of the cause of action of strict liability in tort, the jurisprudence of this State has both initially impelled and continues to adhere to the principles of § 402A of Restatement, Torts 2d (1965). See, e.g., Cepeda v. Cumberland Engineering Co., Inc., 76 N.J. 152, 167-169 (1978); Heavner v. Uniroyal, Inc., 63 N.J. 130, 146-152 (1973). The black letter of § 402A reads in full as follows:
Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
As noted in Cepeda, supra, 76 N.J. at 168-169, the black letter is explicated, qualified and supplemented by its 17 lettered comments, some of which have become fully incorporated into the fabric of the law of this jurisdiction, and none of which has as yet been expressly rejected by our courts. It is Comment (j), to which we subscribe, which we regard as applicable here. Comment (j) reads in full as follows:
j. Directions or warning. In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not *320 generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.
But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.
Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.
Although not heretofore explicitly cited in this jurisdiction, the rationale of Comment (j) expresses the concept, well-established in our tort law, that the supplier of a product not intrinsically defective either in its manufacture or design is nevertheless obliged to warn the consumer of dangers inherent in its use which are known to the manufacturer but of which the consumer is unlikely to be aware. Nor can there be any doubt of the applicability of this rule to the manufacturer of over-the-counter drugs. See, e.g., Martin v. Bengue, Inc., 25 N.J. 359, 366-367 (1957); D'Arienzo v. Clairol, Inc., 125 N.J. Super. 224 (Law Div. 1973).[2]
*321 Defendant does not indeed suggest that it had no duty to warn with respect to the use of Anacin. Its argument is that the warning above quoted was adequate as a matter of law. Adequacy, of course, must be gauged in terms of probable efficacy in sparing the consumer the hazard of a risk not reasonably appreciated by him in his use of the product. The risk here was gastro-intestinal damage attendant upon prolonged use. Applying the principles of Comment (j) here, we are satisfied as a matter of factual hypothesis that if an aspirin product ordinarily produces no adverse effect on the user if taken in the recommended dosage for a short period of time,[3] and if it contains a gastric irritant element which the manufacturer knows is reasonably likely to produce the adverse effect of gastrointestinal bleeding in an appreciable percentage of users if taken regularly over a prolonged period of time, and if the consuming lay public is generally unaware of this inherent danger, then the product is unreasonably dangerous if sold without an accompanying warning as to that specific risk of prolonged use. We are also satisfied that the manufacturer's obvious duty directly to warn the consuming public of this risk cannot be discharged as a matter of law merely by instructing the user to consult his physician. In our view, a reasonable jury could have found each of these underlying hypothetical conditions of liability to have existed on this record. All *322 of them, but for the scope of the lay public's knowledge of the danger of prolonged aspirin use, were the subject of direct proof. As to the matter of lay knowledge, we see no justification at all in this record or in anything appropriately subject to judicial notice for the trial judge's assumption that the danger of prolonged aspirin use is commonly appreciated by laymen. Plaintiff, for one, did not know and there was no suggestion in this record that he should have known. It was clearly for the jury to determine whether in fact that danger is, in Restatement verbiage, as "generally known and understood" among lay consumers as it apparently is in medical and pharmaceutical circles.
In our view, the duty of the manufacturer explicitly to warn consumers of the specific risks of over-the-counter drug use derives from the basic marketing predicate of the over-the-counter drug industry, namely, that nonprescription drugs are purchased by consumers for the purpose of self-medication typically without any intended or actual intervention by a physician. The consuming public may well appreciate that an inherent risk of self-medication is delay or failure in obtaining professional attention for an ailment requiring more than simple symptomatic relief. But it has also been led to believe that while the over-the-counter product may not prove ultimately helpful, neither will it harm if taken as directed. Indeed, a jury would be justified in concluding that the advertising and mass marketing techniques involved in selling aspirin to the consumer are calculated to assure the public of its essential innocuousness and inherent safety. It is indeed this actual and intended direct relationship between the manufacturer and the consumer of over-the-counter drugs, in contradistinction to the interposition between them of the physician where prescription drugs are involved, which accounts for what has become a well-recognized dichotomy in respect of the required recipient of the manufacturer's warning, namely, that while it is the consumer who is entitled to the warning in respect of nonprescription *323 drugs, only the prescribing physician need be warned as to the risks involved in a prescription drug.
The rationale of the warning rule in prescription drug cases is clear. As explained by one commentator
As a general proposition in products liability law there is a duty to warn the intended or foreseeable consumer of a product about its dangerous aspects. This duty exists even where there is an intermediary in the chain of distribution who takes some control over the product and who may himself be negligent. An important and sound exception to the requirement that warning be made to the consumer, however, is made in products cases in which the intermediary is not a mere conduit of the product but rather administers it on an individual basis, or recommends it in some way, implying an independent duty to evaluate the risks and transmit relevant warnings to the user. The ethical drug cases, involving as they always do the epitome of such an intermediary, who exercises independent discretion and judgment, would seem to fit more closely within the exception than the rule. [Rheingold, "Products Liability  The Ethical Drug Manufacturer's Liability," 18 Rutg. L. Rev. 947, 985-986 (1964)]
That rationale has been uniformly accepted by the courts. Thus, in Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5 Cir.1974), cert. den. 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), the court observed that
We cannot quarrel with the general proposition that where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use. This special standard for prescription drugs is an understandable exception to the Restatement's general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products. See Restatement (Second) of Torts, Section 388 (1965). Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. [at 1276; emphasis by the court]
*324 See also, Salmon v. Parke, Davis and Co., 520 F.2d 1359, 1362 (4 Cir.1975); Gravis v. Parke-Davis & Co., 502 S.W.2d 863, 870 (Tex. Civ. App. 1973); Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 992 (8 Cir.1969). Dunkin v. Syntex Laboratories, Inc., 443 F. Supp. 121, 123 (W.D. Tenn. 1971).
Anomalously, it is in the context of the prescription drug cases that the manufacturer's duty to the ultimate consumer in respect of nonprescription drugs has been most clearly articulated. Thus, in Reyes v. Wyeth Laboratories, supra, the court noted that "Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician who acts as a `learned intermediary' between manufacturer and consumer." And in Dunkin v. Syntex Laboratories, Inc., supra, the court again emphasized the prescription/nonprescription dichotomy, observing that the rule relieving the manufacturer of the obligation to warn the consumer "would not apply in a case involving over-the-counter drugs." Again, in Pierluisi v. E.R. Squibb & Sons, Inc., 440 F. Supp. 691, 695 (D. Puerto Rico 1977), another prescription drug case, the court noted that "The emphasis of the doctrine [that a manufacturer's duty is to warn the attending physician and not the lay public] is carefully limited to prescription drugs * * *. An entirely different rule would be applicable in connection with drugs sold over the counter to anyone who asks for them."
There is a surprising dearth of reported cases applying "that entirely different" rule to nonprescription drug cases. Such as there are, however, leave no doubt of the manufacturer's duty to warn the consumer of all specific known risks. See Michael v. Warner/Chilcott, 91 N.M. 651, 579 P.2d 183 (Ct. App. 1978), involving the warning on the label of a nonprescription sinus decongestant containing phenacetin, a medically known producer of kidney disease if taken in large amounts for a prolonged period. The court *325 there reversed a summary judgment in favor of defendant, holding that that risk was required to be unequivocally and unambiguously communicated to the buyer and that the duty to warn as to use of the product could not be discharged simply by a label instruction that the remedy not be taken for longer than 10 days without consulting a physician. And in Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9 Cir.1968), involving Sabin polio vaccine, the court held that where the manufacturer knows that a prescription drug will not be dispensed as such, it is held to the duty of warning the ultimate consumer of known risks of use. As the court there noted:
Here, however, although the drug was denominated a prescription drug it was not dispensed as such. It was dispensed to all comers at mass clinics without an individualized balancing by a physician of the risks involved. * * * In such cases, then, it is the responsibility of the manufacturer to see that warnings reach the consumer, either by giving warning itself or by obligating the purchaser to give warning. Here appellee knew that warnings were not reaching the consumer. Appellee had taken an active part in setting up the mass immunization clinic program for the society and well knew that the program did not make any such provision, either in advertising prior to the clinics or at the clinics themselves. On the contrary, it attempted to assure all members of the community that they should take the vaccine. * * * When drugs are sold over the counter to all comers warnings normally can be given by proper labeling. Such method of giving warning was not available here, since the vaccine came in bottles never seen by the consumer. But other means of communication such as advertisements, posters, releases to be read and signed by recipients of the vaccine, or oral warnings were clearly available and could easily have been undertaken or prescribed by appellee. [at 131]
And see, in accord, Reyes v. Wyeth Laboratories, Inc., supra.
Thus, we perceive the rule applicable to over-the-counter drugs as requiring the consumer to be adequately warned by the manufacturer of all known specific and appreciable inherent product dangers so that he can protect himself from the risks of use whether or not he consults a *326 physician, and this precisely because he is likely to use an over-the-counter product based on his own judgment, molded by advertising, and without ever consulting a physician at all. The point, of course, is that while the distinction in basic marketing techniques between prescription and nonprescription drugs supports a dichotomy as to who in each case must receive the warning, it does not support a dichotomy as to the nature or function of the warning, whether to physician or layman. The physician obviously must be sufficiently warned so that he may prescribe medication after intelligently evaluating its benefits and risks. A consumer of over-the-counter drugs is, as it were, self-prescribing and is intended, expected, and indeed encouraged by the drug industry to do so. He must, therefore, also be given such information by the manufacturer as will permit him to self-prescribe with a minimum of risk. Thus, a warning merely instructing a user to consult a physician as to the product's use is in this context, construable as no warning at all.
The warning we are here dealing with could readily have been found by a jury to be inadequate.[4] Unlike that involved in Michael v. Warner/Chilcott, supra, it does not even unqualifiedly instruct the user to consult a physician before continuing use for more than ten days. Its much more ambiguous message is to consult a physician if pain persists for more than ten days or redness (whatever that vaguely described symptom is intended to mean) is present. A jury *327 could well have concluded that this warning did not even purport to address itself to the existence of an inherent risk of harm in the use of the product but only intended, and could well have been so understood by users, to advise them that if a ten-day regimen did not ameliorate the condition being treated, that condition might be serious enough to require medical advice. Indeed, the warning might well be found to be reasonably understood by the average consumer as not requiring him to consult a physician at all with respect to continued use so long as pain was being relieved and no redress was present. Clearly, a warning reasonably susceptible of either such interpretation cannot be said to constitute a warning that inherent in continued use is the risk of gastrointestinal bleeding.
For the foregoing reasons we are satisfied not only that a clear jury question as to adequacy of the warning was presented, but further that plaintiff's actual consultation with the physician here, even if the latter had acted negligently, did not constitute an independent intervening cause as a matter of law such as would exculpate the manufacturer for liability for the harm. The rule is well settled that a tort-feasor will be held answerable for the consequences of his wrongful conduct despite the occurrence of an intervening cause of the harm provided that the intervening cause was foreseeable or a normal incident of the risk originally created. Rappaport v. Nichols, 31 N.J. 188, 203-204 (1959); Mack Trucks, Inc. v. Reading Co., Inc., 148 N.J. Super. 387, 395-397 (App. Div. 1977); Zinck v. Whelan, 120 N.J. Super. 432, 444-445 (App. Div. 1972). And see Restatement, Torts 2d, §§ 440-443.[5] It is also well settled that ordinarily questions as to proximate cause and the effect, in exculpatory *328 terms, of intervening causes are for the jury. Rappaport v. Nichols, supra.
We are satisfied that a jury could have found the casual reassurance of the physician here to have been either foreseeable or a normal incident of the risk even if a contributing cause of the harm. A jury, for example, might well conclude that the manufacturer should anticipate that a doctor might generally approve of aspirin therapy while the patient is in his care without realizing that his patient intends to use the product indefinitely thereafter despite discharge from treatment. The jury might also conclude that erroneous advice or failure of advice by a doctor regarding prolonged aspirin use is also a foreseeable occurrence. Or a jury might conclude that plaintiff's continued use of the product for a year after being discharged by the doctor constituted a separate negligent episode for which the manufacturer is solely liable. Our point is that since the manufacturer's duty is, in our view, primary and continuing, it cannot, as a matter of law, be automatically insulated or exculpated because of another's subsequent negligent act.
Reversed and remanded for a new trial as to all issues.
NOTES
[1] On cross-examination defendant's attorney attempted to suggest to Dr. Goodman that the internal bleeding was caused by other prescription medication taken by plaintiff during the same period for such chronic conditions as gout and hypertension. Dr. Goodman was, however, steadfast in his opinion that the Anacin was the causative factor.
[2] We are satisfied that where the "defect" of a product is in the failure of an appropriate accompanying warning as to use rather than in a design or manufacture defect, the action is equally sustainable under § 388 of the Restatement, Torts 2d and under § 402A. See, e.g., Sterling Drug, Inc. v. Yarrow, 408 F.2d 978, 992 (8 Cir.1969), a prescription drug case, holding that the gist of the cause of action based on an alleged inadequate warning is the same under both § 388 and § 402A. And see also, Rainbow v. Albert Elia Building Co., Inc., 49 A.D.2d 250, 373 N.Y.S.2d 928 (App. Div. 1975), expressly holding that precisely the same matters must be established in a negligence action as in a strict liability action where the injury is attributed to the failure to warn.
[3] This record does not suggest that aspirin is unsafe when used as directed for a short period for persons having particular physical problems. It is the unsafe prolonged use rather than an inherent danger in use at all which, in our view, distinguishes this case from the situation encompassed by the rationale of Comment (k), which applies to unavoidably unsafe products. Cf. Calabrese v. Trenton State College, 162 N.J. Super. 145 (App. Div. 1978) (anti-rabies vaccine); Brody v. Overlook Hospital, 127 N.J. Super. 331, 339 (App. Div. 1974), aff'd 66 N.J. 448 (1975) (transfusion of blood plasma).
[4] The parties here did not raise a question as to what effect, if any, compliance by defendant with either federal or state requirements for nonprescription drug labelling might have on the issue of adequacy of the warning. See, e.g., 21 U.S.C.A. 352(f); 21 C.F.R. § 201.314(f); N.J.S.A. 24:5-18(f); N.J.A.C. § 8:21-1.17. We address it, however, briefly, in the event it is raised defensively at the retrial we must order. We adhere to the general principle that the minimal requirements prescribed by statute or governmental agency regulation do not constitute a substitution for common-law requirements for adequate labelling and warning. See, e.g., D'Arienzo v. Clairol, Inc., 125 N.J. Super. 224, 230 (Law Div. 1973), and cases therein cited.
[5] The Restatement uses the term "superseding cause" to define an exculpating intervening cause. See § 440. This discrete terminology has apparently not been generally employed in this jurisdiction although its utility in precision of expression is self-evident.