**In re WEST ELECTRONICS, INC.**

**WEST ELECTRONICS, INC., Plaintiff,**

**v.**

**NATIONAL UNION FIRE INSURANCE CO., Defendant.**

**Bankruptcy No. 86–07871.**
**Adv. No. 89–0965.**

United States Bankruptcy Court,
D. New Jersey.

June 12, 1991.

Mesirov, Gelman, Jaffe, Cramer & Jamieson, Robert H. Malis, Robert B. Bodzin, Philadelphia, Pa., for plaintiff and debtor West Electronics, Inc.

White & Williams, Christopher P. Leise, Michael O. Kassak, Westmont, N.J., for defendant Nat. Union Fire Ins. Co.

## OPINION

WILLIAM H. GINDIN, Chief Judge.

### I. Introduction

Presently before the court are the cross-motions of plaintiff, West Electronics, Inc. ("West"), the debtor herein, and defendant, National Union Fire Insurance Co., Inc. ("National Union"), for summary judgment as to liability under a policy of insurance previously determined by this court to be in force and effect at the time of the loss. For the reasons set forth below in the opinion of the court, summary judgment as to liability will be granted in favor of West.

### II. Procedural History

The instant cross-motions for summary judgment are before this court as Phase II of a trifurcated adversary proceeding in which West seeks recovery for an alleged loss under a policy of insurance issued by National Union. During Phase I, this court conducted a trial on the issue of the effectiveness of National Union's purported cancellation of the subject policy. That trial began on January 17, 1990. At the conclusion of Phase I, this court issued an opinion directing a verdict in favor of West holding that the insurance policy was in effect at the time of the loss.

During Phase II, the instant matter, this court will consider the issue of the liability of the parties. Finally, in Phase III, the issue of damages will be determined.

### III. Facts

Since 1972, West had been manufacturing electronic components for use by the military. As the business relationship between West and the government progressed, however, certain problems developed which prompted a government investigation into West's manufacturing procedures. West claims that the investigation severely restricted its cash flow and precipitated its failure to complete certain government contracts which it had been awarded in the

early to mid 1980's by the Navy and the Air Force.

West's financial difficulties culminated in September of 1986 when the Internal Revenue Service ("IRS" or "the Service") put the debtor on notice of certain tax obligations and the existence of a government tax lien on the debtor's property. In early December of 1986, the Defense Contractors Management Service Area ("DCMSA") accelerated its investigation of West and instructed the Defense Contracting Auditing Agency ("DCAA") to audit progress payments made to West. At the same time, many of West's government contracts were terminated for failure to meet delivery and for allegedly deficient manufacture and quality of materials.

Also in December of that year, the IRS began its own investigation of the debtor. Because West failed to make progress in reducing tax delinquencies and because of mounting tax accruals, the IRS began to contemplate a seizure action. Agent Darrell Carp was in charge of the IRS investigation. In early to mid December, he concluded that exigent circumstances existed for a seizure of West's property. On December 17, 1986, the IRS informed West that it had received instructions to seize West's assets. The next day IRS agents appeared, presented West with a tax lien and levied on the property located at the plant and on the building itself.

On December 19, because he believed DCMSA to be the rightful owner of much of West's property, Agent Carp permitted agents from DCMSA to enter the plant and seize part of West's inventory and work in progress.[1] Also on that date, at 4:11 pm, West filed a petition under Chapter 11 of the Bankruptcy Code. Concurrently, the debtor moved for a turnover of the assets seized. On December 24, this court ordered the turnover of all assets seized by the IRS, and much of the material seized by the DCMSA. On December 30 the DCMSA returned the material in a severely

---

**1.** Agent Carp based his belief upon the fact that the government had purportedly made in excess of $3,000,000 in progress payments on the mate-

rial. West asserts that the IRS gave the DCMSA complete control over the premises.

damaged state. Those damages gave rise to the within claim.

Subsequent to the loss, West filed a claim with National Union for coverage under its "all-risk" policy, number 706–6864, which had been issued by National Union on October 15, 1986. National Union denied coverage on the grounds that the policy specifically excluded it under the circumstances.[2]

## IV. Discussion

As a threshold matter this court must establish its jurisdiction. In a companion opinion issued this day, the court has determined that it has jurisdiction over the instant cross-motions pursuant to 28 U.S.C. § 1334(a) and (b). The court has further concluded that the instant matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (E).[3]

This is a motion for summary judgment and is therefore governed by Bankruptcy Rule 7056 which incorporates Fed.R.Civ.P. 56. Rule 56(c) provides that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

The burden of proof is on the movant to show that there is no genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Furthermore, the court is constrained to view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Goodman*

*v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976).

National Union has asserted three specific grounds upon which the coverage sought by West should be excluded. National Union first asserts that West had no insurable interest in the goods which it alleges to have been damaged. Next, it asserts that the policy's governmental acts exclusion operates to exclude coverage under the circumstances of this case. Finally, National Union argues that the damage was caused by West's own criminal acts and that the loss was not fortuitous. This court will consider National Union's defenses to coverage sequentially.

### A. West's Insurable Interest

■ The parties, as well as this court, recognize that in order to sustain recovery under a policy of insurance, an insured must have an insurable interest in the subject property at the time of the loss. The courts of New Jersey have also acknowledged this axiomatic principle of insurance law. *P.R. DeBellis Enterprises, Inc. v. Lumberman's Mut. Casualty Co.*, 77 N.J. 428, 390 A.2d 1171 (1978); *Miller v. New Jersey Ins. Underwriting Ass'n*, 82 N.J. 594, 414 A.2d 1322 (1980).

National Union contends that West did not have an insurable interest in the property and bases that assertion upon an allegation that West did not own the subject property at the time of the loss. National Union argues that because the government had made progress payments in excess of the amount which West has claimed as a loss, the government had title to the subject property at the time of the loss.[4] National Union additionally argues that all of the contracts between the parties had been

---

**2.** The first basis for refusal of coverage, the purported cancellation of the policy, was previously decided by this court in favor of West in Phase I.

**3.** See this court's companion opinion issued this day establishing its jurisdiction, determining this matter to be a core proceeding and addressing related issues. 128 B.R. 900.

**4.** West has alleged a loss of $4,170,288 and National Union asserts that progress payments of

$4,513,776 were made on account of the property at issue. National Union additionally disputes the amount of West's loss and has submitted a report which indicates the value of the loss to be $1,617,729. Because this court's determination is being made solely with respect to liability and not to damages, the court will make no conclusive findings with regard to the party's assertions of value nor will it consider the allegations for any purpose other than the determination of the existence of liability.

terminated for default, and that West consequently had no further expectation of benefiting under its contracts with the government.

National Union relies upon two cases to support its position. In the first, *In re Double H Prods. Corp.*, 462 F.2d 52 (3d Cir.1972), the Third Circuit concluded that partial payments made on a government contract would, in most circumstances, transfer title in the subject property to the government, at least to the extent of those payments. *Id.* at 55. The *Double H* court went on to state that the government's title would even be good as against creditors of a bankrupt government contractor. *Id.* In a thorough analysis of Congressional intent underlying the practice of making progress payments to defense contractors, the Seventh Circuit agreed that upon termination of a contract, title to goods did pass to the government in proportion to the amount of progress payments which had been made. *In re American Pouch Foods, Inc.*, 769 F.2d 1190, 1195 (7th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986).

■ National Union's theory, however, misinterprets the meaning of the term "insurable interest" as expressed in the cases construing the term under the laws of this state. Counsel has failed to recognize that even if West lacked legal title to the property, it may retain an insurable interest. An insurable interest has been determined to exist where:

> the insured derives pecuniary benefit or advantage by the preservation or continued existence of the property *or will sustain pecuniary loss from its destruction. [L]iability to loss from damage to [the property] will be sufficient ... [a]nd a right of property is not an essential ingredient.*

4 J. Appleman, *Insurance Law and Practice*, § 2123, p. 35–37 (1969) (emphasis added). In *Miller, supra.*, the New Jersey Supreme Court considered the effect of an ownership interest in determining whether plaintiffs, in a consolidated appeal, had an insurable interest in real estate. Both plaintiffs were delinquent in payment of real property taxes and, as a result, the city of Newark had foreclosed on their properties. The properties sustained fire damage after the statutory redemption period on the foreclosure judgments had run. The insurer refused payment on the grounds that the plaintiffs did not have an insurable interest at the time of the loss since they did not have title to the real property.

In concluding that the plaintiffs did have an insurable interest, the court held that the plaintiffs' failure to have title did not preclude a finding that they did have insurable interests. *Miller* 82 N.J. at 599, 414 A.2d 1322. Justice Pollack reasoned that "an insured retains an insurable interest as long as he has a reasonable expectation of deriving pecuniary benefit from the preservation of the property or would suffer a direct pecuniary loss from its destruction." *Id.* at 600, 414 A.2d 1322. Although Justice Pollack did specifically refer to cases involving title to real property in articulating his holding in *Miller*, this court finds the underlying rationale equally persuasive in this case.

■ This court finds that West would sustain a pecuniary loss in the event that it failed to fully perform its obligations to deliver the goods it manufactured to the government pursuant to the contract in force between the parties. Counsel for West states that the government has and continues to assert a claim for breach of that contract. (West's brief in reply to National Union's motion at 5–6). That assertion is not controverted in the record. This court agrees that the government's claim is exactly the type of potential liability against which West had intended to insure itself. Thus, even assuming the government had title to the property at the time of the loss, West had an insurable interest.

■ Equally as important in the instant case is the express language of West's insurance policy. Section 1(d)(3) of the policy specifically covers, among other things:

> Personal property of others ... (3) [s]old by the insured under an Installation Agreement whereby the insured's re-

sponsibility continues until the installation is accepted by the purchaser.

This court is cognizant of the rule that exclusionary clauses are to be strictly construed and also recognizes that the rules of construction may not be employed to disregard the clear intent of the policy language. *See Weedo v. Stone-E-Brick, Inc.*, 81 N.J. 233, 405 A.2d 788 (1979); *Butler v. Bonner & Barnewall, Inc.*, 56 N.J. 567, 576, 267 A.2d 527 (1970). This court concludes, however, that West's interpretation of the subject policy, that it covered the property destroyed, is a reasonable interpretation of the language of this section and represents the clear intent of that language. As stated above, West had an obligation to deliver the goods that it manufactured to the government, and its responsibility for those goods continued until the government accepted them. This responsibility is the type contemplated by the policy. Accordingly, it is the determination of this court that West had an insurable interest in the goods at the time of the loss.

### B. The Governmental Acts Exclusion

■ The subject contract of insurance between the parties includes § 4(a) which provides:

> Perils Excluded: This policy does not insure against loss or damage: (a) caused by or resulting from ... confiscation by or destruction by order of any government or public authority, except destruction by order of public authority to prevent spread of fire or explosion, or risk of contraband or illegal trade

National Union asserts that this exclusion applies in the instant case since the loss resulted during, or as a result of, a government seizure. National Union concedes, however, (National Union's brief in support of its motion at 16–17) and West asserts that the exclusion only applies where the government has acted within the scope of its authority.

Both parties have referred this court to the case of *Bankers Fire and Marine Ins. Co. v. Bukacek*, 271 Ala. 182, 123 So.2d 157 (1960). In *Bankers*, IRS agents discovered an illegal still in the insured's home. In an attempt to disable and destroy the still, the agents used dynamite. The ensuing explosion resulted in a fire which caused substantial damage to the insured premises. When the insured sued on the policy, the carrier attempted to avoid liability on the basis of a governmental acts exclusion similar to the one in the instant policy.

After a discussion of authority from other jurisdictions, the *Bankers* court articulated several tests with which to analyze the circumstances in which an exclusionary clause could operate to insulate an insurer from liability under its policy.[5] In each of these tests, the court carefully noted that only acts which arise out of lawful orders will prevent liability. *Bankers*, 271 Ala. at 189, 123 So.2d at 163.

Counsel for National Union also directs this court to *Port Washington Nat'l Bank & Trust Co. v. Hartford Fire Ins. Co.*, 253 A.D. 760, 300 N.Y.S. 874 (App.Div.1937) and asserts that it applies the principles set forth in *Bankers* in a similar factual setting to the instant case. Counsel contends that in *Port Washington* a similar exclusionary clause was enforced and asserts that the case supports an identical conclusion in the matter at bar.

In *Port Washington*, plaintiff, the executor of the estate of the insured, the mort-

---

**5.** The rules from [the] cited cases appear to be that the order [by government or public authority] is the cause of the loss and [the] insurer is not liable when the loss is the unintended result of an act, done as directed, in execution of a lawful order made in good faith and within the apparent scope of the powers of the civil authority issuing the order, and in such case [the] insured cannot question the necessity for such order under the circumstances of the particular case; or, when the loss is the unintended result of the inadvertent or negligent doing of an act actually or apparently, reasonably necessary to execute a lawful order. On the other hand, the order is not the cause of the loss and [the] insurer is liable: when the act causing the loss is done by mistake and is not an act ordered to be done; or when the act is not actually or apparently, reasonably necessary to execute the order; or when the act is not one the civil authority is authorized by law to do or order to be done; or when the act is done, not in execution of the order received, but to gratify the ill will of the actor. *Id.*, 123 So.2d at 163.

gagee of the subject premises, sought to collect the proceeds of a fire insurance policy. Agents from the IRS discovered an illegal still on the premises and attempted to render it useless under the authority of former 26 U.S.C. § 1204.[6] The agents overzealously employed acetylene torches in their endeavor to disable the still, resulting in the building being inadvertently set on fire.

In holding that the judgment in favor of plaintiff awarded at a jury trial must be reversed and in holding that the complaint must be dismissed, the court stated that "[i]t is to be *presumed* that the officers acted legally" *Id.,* 300 N.Y.S. at 875 (emphasis added). Because the issue before the court in the instant matter is precisely whether the IRS agents acted legally *Port Washington* is inapposite and not applicable in the instant context.[7]

Having determined that the governmental acts exclusion hinges upon the propriety of the seizure, the court will next consider its legality.[8]

## C. The Propriety of the Seizure

■ The Fourth Amendment to the United States Constitution provides protection against warrantless, unreasonable searches and seizures of private property with limited exception. *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The protections of the Fourth Amendment which apply to protect the interests of own-

6. **§ 1204. Destruction of distilling apparatus in forfeiture proceedings.** When a judgment or forfeiture, in any case of seizure, is recovered against any distillery used or fit for use in the production of distilled spirits, because no bond has been given, or against any distillery used or fit for use in the production of spirits, having a registered producing capacity of less than one hundred and fifty gallons a day, for any violation of law, of whatever nature, every still, doubler, worm, worm tub, mash tub, and fermenting tub therein shall be so destroyed as to prevent the use of the same or of any part thereof for the purpose of distilling; and the materials shall be sold as in case of forfeited property.

And in case of seizure of a still, doubler, worm, worm tub, mash tub, fermenting tub, or other distilling apparatus, having a less producing capacity than one hundred and fifty gallons per day, for any offense involving forfeiture of the same, where said apparatus shall be of less than $500 value, and where it shall be impracticable to remove the same to a place of safe storage from the place where seized, the seizing officer is authorized to destroy the same only so far as to prevent the use thereof, or any part thereof, for the purpose of distilling. Such destruction shall be in the presence of at least one credible witness, and that such witness shall unite with the said officer in a duly sworn report of said seizure and destruction, to be made to the Commissioner, in which report they shall set forth the grounds of the claim of forfeiture, the reasons for such seizure and destruction, their estimate of the fair cash value of the apparatus destroyed, and also of the materials remaining after such destruction, and a statement that, from facts within their own knowledge, they have no doubt whatever that said distilling apparatus was set up for use and not registered, or had been used in the unlawful

distillation of spirits and that it was impracticable to remove the same to a place of safe storage.

Within one year after such destruction the owner of the apparatus so destroyed may make application to the Secretary, through the Commissioner, for reimbursement of the value of the same; and unless it shall be made to appear to the satisfaction of the Secretary and the Commissioner that said apparatus had been used in the unlawful distillation of spirits, the Secretary shall make an allowance to said owner, not exceeding the value of said apparatus, less the value of said materials as estimated in said report; and if the claimant shall thereupon satisfy said Secretary and Commissioner that said unlawful use of the apparatus had been without his consent or knowledge, he shall still be entitled to such compensation, but not otherwise. And in case of a wrongful seizure and destruction of property under the foregoing provisions, the owner thereof shall have right of action on the official bond of the officer who occasioned the destruction for all damages caused thereby.

7. It is interesting to note that in his dissenting opinion, Judge Haggerty stated that there was no proof that the agents were lawfully upon the premises. *Id.,* 300 N.Y.S. at 875–76 (Haggerty, J. dissent). The majority simply failed to address this issue.

8. National Union has asserted that, until now, West had not challenged the legality of the seizure. National Union seems to suggest by this allegation that West has waived its ability to raise this issue. Nowhere has National Union provided authority to support such an argument. Furthermore, it is in the context of the instant motion that West would be expected to raise it.

ers of residential property also protect owners of commercial property. *Donovan v. Dewey*, 452 U.S. 594, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981)[9]; *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); *See v. Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). West argues that the seizure by the IRS was unlawful because it violated the Fourth Amendment of the United States Constitution and was conducted in violation of IRS regulations. Counsel for National Union urges this court to conclude that the search was proper by asserting that exigent circumstances existed and alleges that the seizure did not violate IRS regulations.

Both parties have directed this court to the case of *G.M. Leasing Corp. v. United States*. In *G.M. Leasing*, the IRS was pursuing George I. Norman ("Norman") for failure to pay income taxes. The Service initiated its investigation of Norman when it discovered that his income tax deficiencies amounted to approximately $1,000,000.[10] Revenue agents arrived at the Norman residence seeking to collect the taxes due. At that time, the agents observed several cars which they later confirmed to be property of either Norman or corporate entities which he controlled. After the agents levied on the cars at the Norman's home, they went to his office to levy on all property located there, including the building itself. Subsequent to making a warrantless entry into the premises, the agents decided to confirm the status of the building rather than to proceed. When the IRS confirmed that the location was a place of business and observed boxes being carried out at night, the agents decided to levy on the property located at the business premises. Two days later, the agents returned, again without a warrant, entered the premises and seized all property located therein.

After a brief discussion of the levy power of the IRS and the issue of the seizure of the cars located at the Norman's residence, the court discussed the Fourth Amendment issues involved in the warrantless seizure of property located on the business premises. The court confirmed the Fourth Amendment principles articulated above in stating that

> [w]e therefore decline to read [the statute authorizing the IRS to levy to collect taxes due] as giving carte blanche for warrantless invasions of privacy.... The intrusion into petitioner's office is therefore governed by the normal Fourth Amendment Rule that "except in certain carefully defined classes of cases a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

*Id.* at 358, 97 S.Ct. at 631 (citing *Camara* 387 U.S. at 528–29, 87 S.Ct. at 1730–31).

The Court went on to discuss the alternative argument of the Service, that a warrant was unnecessary because "exigent circumstances" existed. The Court concluded, however, that

> [t]he agents' own actions ... in their delay for two days following their first entry, and for more than one day following the observation of materials being moved from the office, before they made the entry [and seizure], are sufficient to support the District Court's implicit finding that there were no exigent circumstances in this case.

*Id.* at 358–59, 97 S.Ct. at 631. Furthermore, Chief Justice Burger expanded upon the discussion of the lack of exigency in a separate concurring opinion. The Chief Justice specifically identified the agents'

---

**9.** In *Donovan,* the Supreme Court held that although "[t]he interest of the owner of commercial property is not one in being free from any inspections ... the Fourth Amendment protects the interest of the owner of [commercial] property in being free from *unreasonable* intrusions onto his property by agents of the government." *Donovan,* 452 U.S. at 599, 101 S.Ct. at 2538. The court went on to state that even "[i]nspec-

tions of commercial property may be unreasonable if they are not authorized by law...." *Id.*

**10.** Additionally, Norman was a fugitive from justice at the time the investigation had reached this stage which also contributed to its activation. *G.M. Leasing,* 429 U.S. at 341, 97 S.Ct. at 623.

delay after observing the suspicious removal of cartons from the premises as rendering the exception to the warrant requirement unavailable. *Id.* at 361, 97 S.Ct. at 633 (Burger, C.J. concurring).

To determine whether or not exigent circumstances existed at the time of the seizure, on December 18, 1986 this court has conducted an extensive review of the record and exhibits provided by the parties. Upon that review, this court has come upon the following uncontroverted testimony from the deposition of Internal Revenue Service Agent Darrell M. Carp: [11]

Q. You say in this case you believed it was exigent circumstances?

A. Yes, sir.

Q. Could you tell us what you mean by that? What were the exigent circumstances?

A. I do recall a conference I had with some individual—the name I don't recall—from the Army or the Air Force in Philadelphia.

Q. Colonel Bates?

A. Perhaps that's his name.

Q. Mr. Carp—

[Continuing at page 48, line 4]

Q. You had conversation with some individual from the Air Force or what?

A. Yes.

Q. And I said is it Colonel Bates.

A. The name rings a bell. I can't say that was the fellow's name for sure. Probably it was.

Q. Anybody else in mind, other than Colonel Bates?

A. I believe I spoke with his subordinate as well, who is, I believe, a Major.

Q. A Major who?

A. I don't recall the name.

[Continuing at page 48, line 18]

Q. When did that conversation take place?

A. Prior to the date of seizure; the exact date I don't recall.

Q. Prior to your visit to Mr. Carson, Vice President of West?

A. Probably.

[Continuing at page 52 line 16]

Q. So on or about the 16th of December, you were there, and you asked for the signature of a paper that would allow you to go inside the plant?

A. I asked for the taxpayer's consent.

Q. To do what?

A. The taxpayer's consent to do the seizure. There is a hard way to do things and there is an easy way to do things.

As far as I was concerned, I was going to stop him from incurring any more liabilities. It was either going to be—he was going to help me or he was going to hinder me.

Q. I am going to show you a paper which I have identified as P–18, and ask you if that is not the consent form.

[Continuing at page 53, line 11]

A. This looks like our standard consent form, yes.

Q. And that would give you, that is Internal Revenue Service employees, the right to seize inventory, remove property and sell; isn't that correct?

A. Yes, sir.

Q. And you came to get this, and it was denied you?

A. Correct.

Q. But you said to us a little bit ago that there is an exception to the manual which permits you to do these same things if there is exigencies—exigencies exist for the benefit of the government's collection of the tax; is that correct?

A. That is correct.

Q. And I was going to ask you what the exigencies were, and you related that Corporal [sic] Bates called and you had verified the call and called back, and then Mr. Corporal [sic] Bates had apparently spoken to you about West?

A. That is correct.

Q. Will you tell us what he said?

A. To the best of my recollection?

Q. Yes.

---

**11.** The deposition of Agent Carp is attached as Exhibit D to the brief of National Union in support of its motion and as Exhibit C to the brief of West in reply. The material quoted begins at page 47, line 9.

A. He had mentioned to me that to his knowledge there were assets of West Electronics that were being removed from the premises during evening hours and at other strange times. He advised me.

Q. Are you sure that he told you that?

A. To the best of my recollection, yes.

He also advised me along the lines that there was money that was being spirited away, money that should have been used for paying taxes.

I put that together with the fact that the taxpayer had more often than once violated his installment agreement, and decided that if we were to collect this money at all, action had to be taken immediately.

■ The testimony of Agent Carp establishes that the IRS was informed by the DCMSA at least two days prior to its attempted seizure of December 16 that West was allegedly engaged in activity which may be characterized as suspicious or could give rise to exigent circumstances. As demonstrated by the Supreme Court's analysis in *G.M. Leasing*, as a matter of law, there is simply no justification for the Service's failure to obtain a warrant enabling execution of its levy on the private premises of the debtor where the IRS had obtained its information at least as much as two days prior to the seizure. Moreover,

Agent Carp attempted to get the consent of West to allow the levy two full days prior to the warrantless seizure. This consent was denied. At least at that point, the IRS must have known that a warrant would be required to execute its levy. Accordingly, it is the determination of this court that no exigent circumstances existed at the time of the seizure which would relieve the IRS of its duty to obtain a warrant.

■ Associated with the question of the propriety of the search is the issue of whether Agent Carp's actions violated IRS regulations.[12] In this regard the court has examined the report issued by David R. Hannum [13] and the affidavit of Agent Carp.[14] The gravamen of these two documents is that Carp had a reasonable certainty that exigent circumstances existed, thereby permitting him to levy on the debtor's property without first obtaining a Writ of Entry from the District Court.[15]

For the reasons set forth above, this court concludes, as a matter of law, that any determination by Agent Carp that exigent circumstances existed was unreasonable. This court additionally notes that although Agent Carp states that "a Writ of Entry normally took 60 to 90 days to secure" (Affid. of Carp at ¶ 7) and that he "had never seen [a revenue officer obtain a Writ overnight]" (*Id.*), Carp admits that he "had been advised by supervisors that it

12. Section 56(12)4.4 of the Internal Revenue Service Manual states, in pertinent part, as follows:

(1) If the revenue officer observes situations that can be described as "exigent circumstances," the private portion of the premises can be entered without a writ of entry. A seizure under exigent circumstances may be defined as a seizure that must be made immediately, because there is not ample time to secure the necessary writ of entry to prevent the taxpayer from putting property beyond the reach of the Service. A jeopardy or termination assessment by itself is not sufficient to satisfy this exigent circumstances exception. Removal of property from the taxpayer's premises in the ordinary course of business, such as the delivery of merchandise sold to customers, is not an exigent circumstance. In cases where exigent circumstances exist, the revenue officer may immediately enter private premises, from which property is being removed, without waiting for the writ of en-

try, to protect the interests of the government. The revenue officer should be reasonably certain that the taxpayer is attempting to put property beyond the reach of the Service before a seizure under exigent circumstances is made. The case file should be documented with the facts that led to a determination that "exigent circumstances" existed. I.R.S. Manual § 56(12)4.4 (1985).

13. Mr. Hannum was retained by National Union for the purposes of assessing the propriety of Agent Carp's actions. Mr. Hannum's seven page report is attached as an exhibit to National Union's brief in support of its motion.

14. The affidavit of Agent Carp is annexed to National Union's brief in reply to West's motion.

15. Both Hannum and Carp acknowledge that obtaining a Writ of Entry is the correct procedure. Hannum does it explicitly while Carp's recognition is implicit. (Report of Hannum at ¶ 2; Affidavit of Carp at ¶ 6–¶ 7).

was possible to get a Writ of Entry overnight...." *Id.* Furthermore, Carp testified at his deposition that it would take "minimum time" to get a warrant to seize without the consent of the taxpayer under ordinary circumstances where there were no exigencies and that "it can be done overnight." (Deposition at p. 81 lines 22–25).

■ In addition, the IRS regulations specifically call for observation by the revenue officer. IRS Manual § 56(12) 4.4; *infra.* at n. 13. In the instant matter, Agent Carp did not observe any situations which may be described as exigent because he personally observed nothing at all. The removal of equipment was observed by individuals with the Department of Defense and not by revenue officers. The information was then conveyed to Carp by Colonel Bates at least several days prior to the seizure. Furthermore, West has alleged that it specifically advised the IRS that it was shipping goods overseas and would use the proceeds to pay a portion of its taxes. The IRS regulations specifically state that "[r]emoval of property ... in the ordinary course of business ... is not an exigent circumstance." *Id.* Consequently,

this court concludes that Agent Carp's conduct also violated IRS procedure.

### D. West's Acts

National Union has asserted two arguments with respect to West's acts. First, National Union alleges that the loss should be excepted from coverage because it resulted from West's own criminal acts, namely its failure to pay taxes. Second, National Union argues that the loss was not fortuitous since it arose out of West's failure to comply with the terms of the government contracts and/or its failure to pay taxes.

■ National Union asserts that § 4(c) of the policy excludes coverage for damage "[c]aused by any fraudulent, dishonest or criminal act done by or at the instigation of any insured...." Although National Union properly indicates that willful failure to pay taxes is a criminal misdemeanor under 26 U.S.C. § 7203,[16] it has failed to prove that West's acts were criminal or that West's acts were the proximate cause of the loss.[17]

The record in this case does not reflect that West was ever accused of, charged with, or even investigated for willfully failing to pay its taxes. The IRS investigation

---

16. **Sec. 7203. Willful failure to file return, supply information, or pay tax.**

Any person required under this title to pay any estimated tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation) or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting "5 years" for "1 year"

17. In Footnote 5 of its brief in support of its motion for summary judgment, National Union directs this court to the cases of *Middlesex Mut.*

*Ins. Co. v. Bright,* 106 Cal.App.3d 282, 165 Cal. Rptr. 45 (Ct.App., 4th Dist.1980) and *National Union Fire Ins. Co. v. Miller,* 192 Cal.App.3d 866, 237 Cal.Rptr. 632 (Ct.App., 4th Dist.1987) in support of its argument that a violation of law exclusion will apply regardless of the causal connection between the insured's criminal act and the ensuing loss. For the following reasons this court rejects the argument advanced by National Union. First, as discussed above, there is no proof that West committed a criminal act. Second, this court has discovered authority analyzing similar circumstances which is directly contrary to the position asserted by National Union. *See, e.g., Puckett v. U.S. Fire Ins. Co.,* 678 S.W.2d 936 (Tex.1984). This court declines to follow the California position and instead is persuaded by the Texas Court's rationale that the alleged criminal acts should be causally related to the loss. Finally, it should be noted that this line of cases deals exclusively with aviation and the manner in which the aircraft was flown. The inherent risks in aviation do not extend to nonpayment of taxes. As a result, this court will not extend liability without causation in this case.

wās a civil investigation aimed at collecting back taxes and had no criminal element. Furthermore, the investigation by the DCMSA was similarly not a criminal one. National Union has adduced no evidence to support an assertion that West acted criminally pursuant to the statute.

In addition, West's acts were not the proximate cause of the loss. Proximate cause, or legal cause, is the concept which limits liability on the basis of reasonableness and foreseeability. *See generally* Prosser and Keeton, *Torts* § 42 at 273–75. To be compensable, a loss must be proximately caused by a peril against which the party is insured. *James v. Federal Ins. Co.*, 5 N.J. 21, 26, 73 A.2d 720 (1950). National Union argues, however, that where the causal links in the chain of events involve excepted perils that these excepted perils should be deemed to be the proximate cause of the loss. In support of that proposition National Union cites *Torsiello v. Whitehall Laboratories, Div. of Home Prods, Corp.*, 165 N.J.Super. 311, 398 A.2d 132 (App.Div.), *certif. denied*, 81 N.J. 50, 404 A.2d 1150 (1979).

*Torsiello* involved a products liability action for failure to warn against certain side effects of Anacin. In a brief discussion of the effect of intervening causes and their impact on liability, Judge Pressler acknowledged the longstanding principle "that a tortfeasor will be held answerable for the consequences of his wrongful conduct despite the occurrence of an intervening cause of the harm...." *Id.* at 327, 398 A.2d 132. It is this language upon which National Union seems to rely. However, in completing that very sentence, Judge Pressler also completed her statement of the rule by noting that the tortfeasor was only liable *"provided that the intervening cause was foreseeable or a normal incident of the risk originally created." Id.* (emphasis added).

In the instant case, the intervening acts in the chain of causation were both unforeseeable and were not a normal incident of the risk originally created by the nonpayment of taxes. The damage which occurred here was as a result of an illegal entry and seizure of goods by the IRS. Moreover, the damage was proximately caused by the illegal action of the Service in addition to the negligence of the DCMSA.[18] The destruction of property by an entity unrelated to the IRS after an illegal tax seizure is not foreseeable and is not a normal consequence of nonpayment of taxes.

Even assuming arguendo that West's acts could be characterized as excluded under the policy, the view espoused by this court today is consistent with the law of New Jersey. In *Stone v. Royal Ins. Co.*, 211 N.J.Super. 246, 511 A.2d 717 (App. Div.1986) the Appellate Division of the Superior Court of New Jersey permitted recovery where the insured risk was the proximate cause of the harm even though an excepted peril initiated the chain of causation.

In *Stone*, homeowners sought to recover an insurance claim for water damage to their basement. The damage was caused by the rupture of a hose connecting their sump pump to a drain. While the policy did cover "accidental ... overflow of water from within a plumbing ... system or from within a household appliance ...", the policy contained a clause which excluded coverage for damage from surface water. *Stone*, 211 N.J.Super. at 248, 511 A.2d 717. The court noted that the purpose of the sump pump was to remove surface water and that the surface water, an excluded peril, initiated the loss-producing chain of causation. The court concluded, however, that because the final event in the chain

---

**18.** Even if the DCMSA did own the goods the fact remains that the results of West's nonpayment of taxes in this case were not foreseeable or a normal incident of nonpayment. It is also interesting to note that National Union has asserted that it informed West that the DCMSA would be permitted to seize its assets one day before the seizure. (Brief in support of motion for summary judgment at p. 25). This assertion is contradictory to the testimony of Agent Carp who stated that he determined that the DCMSA owned the property after the seizure. (Carp Deposition at page 75–80).

was an insured risk the insurance company was liable under the policy.

In the instant case, West's acts similarly began the chain of causation. The final events and the proximate cause of the loss, however, were insured risks, the negligence of the DCMSA and the illegal acts of the IRS.

National Union's final argument for exclusion is that the loss should be implicitly excluded from coverage because it was not fortuitous. National Union claims that the loss resulted from West's intentional failure both to pay its taxes and to comply with the terms of the government contracts.

In order to be compensable West's loss must have been fortuitous. *Intermetal Mexicana, S.A. v. Insurance Co. of N. Am.*, 866 F.2d 71 (3d Cir.1989). In *Intermetal Mexicana*, the Court of Appeals for the Third Circuit was confronted with determining whether a particular loss was fortuitous. The insured, Intermetal Mexicana, had sued its insurance company to recover for goods damaged after a seizure by the insured's creditor and for conversion. The court was faced with two dates upon which to analyze the issue of fortuity, the date of the initial seizure and the date upon which the insured attempted to retrieve the goods. The court defined a fortuitous event to be "an event which so far as the parties to the contract are aware is dependent on chance." *Id.* at 77. Based upon his definition, Judge Cowan held that "there is nothing fortuitous about the fact that a creditor ... would resort to the courts to obtain collateral for unpaid debts." *Id.* Consequently, he concluded that the initial taking was not a recoverable loss where the creditor had obtained a court order permitting it to do so. Judge Cowan did determine, however, that the subsequent failure by the creditor to return the goods, where the insured had obtained a lawful order requiring their turnover, was a fortuitous event. *Id.* at 78.

In the instant case, not only were the consequences of West's nonpayment of taxes unforeseeable and unexpected, but

the conduct of the IRS was illegal. To be sure, Judge Cowan's determination that a creditor's failure to comply with a court order constitutes a fortuitous loss, implies that the IRS's illegal conduct, a crucial link in the instant causal chain, must also result in a fortuitous event. This inference is inescapable where the actions of the IRS were not only unforeseeable and unexpected, but they were also illegal. The fact that West's own conduct was in the chain of causation does not alter that conclusion. Accordingly, the loss in question was fortuitous.

## V. *Conclusion*

For the reasons set forth above, summary judgment is awarded in favor of West. The matter will proceed to Phase III with trial on the issue of damages to be scheduled by the court.